STATE OF CONNECTICUT *v.* JASON J. OSIMANTI
(AC 28258)

Bishop, Robinson and Mihalakos, Js.

Argued September 22—officially released December 23, 2008

*Lauren Weisfeld,* assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett,* supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Joseph J. Harry,* senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Jason Osimanti, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1). On appeal, the defendant claims that the trial court (1) denied him his constitutional and statutory rights to present relevant self-defense evidence, (2) improperly instructed the jury on self-defense, (3) failed to inquire adequately into alleged juror bias and (4) improperly instructed the jury on reasonable doubt. We affirm the judgment of the trial court.

The jury heard the following evidence from which it reasonably could have made factual determinations. On July 14, 2005, the defendant was at Custom Creations, an auto body shop owned by Orlando Rodriguez, located at 68 Elizabeth Street, Bridgeport. Rodriguez' apartment, located at 39 Elizabeth Street, was across the street. Adjacent to the shop was an empty lot. The defendant, a painter, had just returned from Rodriguez' apartment, where the defendant was monitoring the

progress of two painters who were working for him. While at the shop, the defendant had been drinking alcohol, but he did not appear to be intoxicated. At one point, Rodriguez asked the defendant to pick up John Barnum, the victim, and to bring him to the shop. Rodriguez had been friendly with the defendant and the victim for "a couple of years."

When the defendant returned to the shop with the victim, both men appeared to be angry, and they were arguing. The victim accused the defendant of driving erratically on the way back to the shop. The argument between the defendant and the victim increased to the point that the victim threw things at the defendant and tried to fight him. Concerned that the argument was escalating, Rodriguez stepped between the defendant and the victim and told them to take their argument outside.

After the defendant and the victim went into the empty lot adjacent to the shop, their argument turned physical. At trial, Rodriguez could not recall who threw the first punch. Cynthia Morales, Rodriguez' live in girlfriend,[1] indicated that as she was returning home from the grocery store, she saw the altercation. She and Rodriguez told the defendant to get into his car, which was parked in front of the shop, and to go home. Once Rodriguez was eventually able to separate the two men, he told the defendant again to leave, and Rodriguez pushed the victim into his shop, and he positioned himself at the shop's front door to prevent the victim from going outside.

At this point, the defendant went to his car, from which he retrieved a four inch long painter's hook. This was the first time that Rodriguez had seen either man with a weapon. Upon seeing the defendant with the

---

[1] On the date of the incident, Morales and Rodriguez lived together. They were no longer involved or living together at the time of the trial.

hook, the victim took a mallet[2] from the shop and returned to the empty lot where he used the mallet to strike the defendant in the back. Rodriguez took the mallet from the victim and pushed the victim back inside his shop, but the victim immediately exited the shop through a side door and returned to the lot where a second physical altercation ensued between the victim and the defendant. At this point, Rodriguez separated the two men, told the defendant to go home and began walking the victim toward the apartment he shared with Morales. As Rodriguez was pushing the victim along the street toward his apartment, the victim was screaming at the defendant and trying to break free from Rodriguez' grasp while the defendant, in turn, was antagonizing the victim to fight with him. Morales, who had since returned to the apartment, could see Rodriguez and the victim approaching. Once Rodriguez and the victim had reached the apartment driveway, Morales came downstairs, where she and Rodriguez calmed the victim down. At that point, the victim was no longer arguing with the defendant.

George Castellini, who lived across the street from Custom Creations, saw the defendant approach Rodriguez and the victim as they were walking away from the lot. He heard Rodriguez tell the defendant to leave and the victim to go into his apartment. The victim, however, refused to go into the apartment because Rodriguez' children were inside and the victim had to "put a stop to [the defendant]."

As the defendant neared, Rodriguez observed that he was carrying a Sheetrock knife.[3] The victim, in turn,

---

[2] Rodriguez testified that when the victim left the shop, he was wielding a "rubber mallet." George Castellini, who witnessed the incident from across the street, testified that it was a "five pound sledgehammer . . . a heavy duty mallet."

[3] The object causing the victim's death was variously referred to as a "knife," "Sheetrock knife," "saw," "Sheetrock saw" and "keyhole saw."

did not have any weapons. Castellini heard Rodriguez say, "Don't you dare come over here," and he heard the victim say, "What are you going to do with that knife?" The defendant stopped following Rodriguez and the victim after Rodriguez shouted for him to stay away. At this point, the defendant was approximately forty-five feet from his vehicle and sixty to seventy feet from the victim and Rodriguez. The victim then walked back into the road and toward the defendant where the two men continued arguing. The victim charged the defendant, and the two men began wrestling in the street near the empty lot. The defendant then swung the Sheetrock knife at the victim to keep him at bay. Rodriguez returned to the lot and separated the men again, both men moving to opposite sides of the street. As the defendant bent down to pick up the knife that had fallen to the ground, Rodriguez charged him, knocking the defendant to the ground. While Rodriguez had the defendant pinned to the ground, the victim began kicking the defendant. The defendant claimed that as Rodriguez got off of him and separated him and the victim, the defendant grabbed the Sheetrock knife and tried to stand up because he did not want to be struck again and he feared that if he did not get up, Rodriguez and the victim would kill him. As the defendant was attempting to regain his footing, he and the victim resumed fighting. As the defendant arose, he swung the Sheetrock knife at the victim, stabbing him twice in the chest. Bleeding, the victim fell to the ground and died soon thereafter.

Immediately after the stabbing, the defendant walked to his car and left, taking the Sheetrock knife with him. He was subsequently arrested at his home and taken to the police station, where he admitted that he stabbed the victim but asserted that he acted in self-defense. The defendant was charged with one count of murder

in violation of General Statutes § 53a-54a (a). On September 18, 2006, after a jury trial, the defendant was found not guilty of murder but guilty of the lesser included offense of manslaughter in the first degree in violation of § 53a-55 (a) (1).[4] On October 23, 2006, the defendant was sentenced to the custody of the commissioner of correction for a period of twelve years, and upon completion of this sentence, to a term of five years special parole. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that certain of the court's evidentiary rulings constituted an abuse of discretion and deprived him of his constitutional right to present a claim of self-defense as guaranteed by the fifth, sixth and fourteenth amendments to the United States constitution and article first, § 8, of the constitution of Connecticut. He argues, also, that the court's limitation of his cross-examination of the victim's former girlfriend, Angela Giglio, obstructed his constitutional right to confrontation. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. During voir dire of Giglio, outside the presence of the jury, the state limited its direct examination regarding her interactions with the victim to the period of February, 2005, to July 14, 2005. In response, the defendant made an offer of proof, on the basis of police reports concerning arguments between Giglio and the victim that occurred prior to February, 2005, in an effort to demonstrate, by cross-examination of Giglio, that the victim had a propensity

---

[4] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

for violence when intoxicated. In response to questioning by the defendant, Giglio testified that she did not remember the incident described in an October, 2003 police report that was shown to her, but she did recall getting into arguments with the victim at times and calling the police because he would not leave her house. She further testified that during the 2003 time frame, she occasionally feared that her arguments with the victim would become physical, and, in response to the defendant's questioning, Giglio acknowledged that the victim had violated a protective order that she had obtained from the court. When the defendant asked Giglio if she remembered telling the police that when the victim drank he became violent, she answered affirmatively but noted that the victim did not get violent every time he drank. On the basis of this testimony elicited during voir dire, the defendant requested that he be permitted to question Giglio, before the jury, about incidents that occurred prior to February, 2005. Specifically, the defendant sought to question Giglio about comments she had made to police officers that the victim was "nice when he's not drinking alcohol" and her fear that the victim would be "violent to her." The court denied the defendant's request. Thereafter, Giglio testified before the jury that she had known the victim for nine years and was the mother of his children. In response to the state's question on direct examination as to whether Giglio had contact with the victim between February and July, 2005, she indicated that she had approximately sixty contacts with the victim during that period. She further testified that she was of the opinion that the victim was not a violent person during that period.

Although the court limited the defendant's cross-examination of Giglio to events that occurred after February, 2005, it admitted evidence that the victim had been convicted of (1) threatening in the second degree

on May 26, 2004, (2) assault in the third degree, four separate times, between July 16, 1993, and June 26, 2002, and (3) assault in the second degree on September 24, 1990. The jury also heard testimony that the victim was in prison numerous times between 1982 and 2004 and that the department of correction had designated him a member of the Latin Kings street gang. Further, the defendant was able fully to cross-examine each witness who observed the confrontation and to present witnesses on his behalf to establish his self-defense claim. The defendant also testified that the victim had told him that the victim was "down with the Hell's Angels" and a Latin King, gangs that the defendant knew to be extremely violent. Through such testimony, the defendant was able to establish that he feared the victim, that he feared for his life when he was held down by Rodriguez and kicked by the victim, and that he did not believe that he could safely retreat to his car. The defendant introduced evidence that the victim was the initial aggressor and that the victim never withdrew from the confrontation.

We next set forth the applicable standard of review. "Our standard of review of a claim that the court improperly limited the cross-examination of a witness is one of abuse of discretion. . . . [I]n . . . matters pertaining to control over cross-examination, a considerable latitude of discretion is allowed. . . . The determination of whether a matter is relevant or collateral, and the scope and extent of cross-examination of a witness, generally rests within the sound discretion of the trial court. . . . Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . .

"The court's discretion, however, comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment

[to the United States constitution]. . . . The sixth amendment . . . guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . As an appropriate and potentially vital function of cross-examination, exposure of a witness' motive, interest, bias or prejudice may not be unduly restricted. . . . Compliance with the constitutionally guaranteed right to cross-examination requires that the defendant be allowed to present the jury with facts from which it could appropriately draw inferences relating to the witness' reliability. . . . [P]reclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment. . . . In determining whether such a violation occurred, [w]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Thomas*, 110 Conn. App. 708, 721–22, 955 A.2d 1222 (2008).

The defendant argues that the excluded testimony regarding the victim's propensity for violence would have raised a reasonable doubt as to the evidence produced by the state to disprove self-defense because it included evidence that the victim violated a protective order obtained by Giglio and that the victim became violent when drunk. The defendant contends that without that testimony, the jury could not fairly evaluate the issue of who had been the initial aggressor and the reasonableness of the defendant's acts or state of mind in response to the victim's conduct during the altercation. We are not persuaded.

We conclude that the defendant's cross-examination of Giglio was not unduly restricted and that the limitation imposed by the court did not infringe on the defendant's confrontational and due process rights. Even without Giglio's testimony regarding events between her and the victim prior to February, 2005, there was a wealth of testimony regarding the victim's propensity for violence. Moreover, the limitation imposed by the court did not prejudice the defendant because there was no dispute that the victim was violent during his fatal altercation with the defendant. Accordingly, we conclude that the court did not abuse its discretion or deprive the defendant of any constitutional rights in restricting the scope of defense counsel's cross-examination of Giglio.

II

The defendant next claims that the court improperly instructed the jury regarding self-defense.[5] Specifically, the defendant argues that the court failed to charge the jury as requested and, instead, confused an initial aggressor's obligation to withdraw with the duty of one using deadly force to retreat if such retreat is available and known to be completely safe. We find the defendant's allegation to be without merit.

It is well noted that "[a] fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . . This fundamental constitutional right includes proper jury instructions on the

---

[5] The defendant also argues that the jury charge improperly removed from the jury the factual question of whether he was at his place of work at the time of the incident. Pursuant to General Statutes § 53a-19 (b), an "actor shall not be required to retreat if he or she is in his or her . . . place of work . . . ." The record reveals, however, that the stabbing occurred in an empty lot, which was a public place, not the defendant's place of work. Therefore, we need not reach the question of whether Rodriguez' apartment, where the defendant claimed he was working, could be construed as his workplace.

elements of self defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. . . . An improper instruction on a defense . . . is of constitutional dimension. . . . [T]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. . . . In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal quotation marks omitted.) *State* v. *Terwilliger*, 105 Conn. App. 219, 225–26, 937 A.2d 735, cert. granted on other grounds, 286 Conn. 902, 943 A.2d 1103 (2008).

The defendant argues that the court's use of the word "retreat" and then "withdraw" in the initial aggressor instruction confused the jury.[6] The defendant also notes

[6] The challenged portion of the court's self-defense instruction is as follows: "The self-defense statute focuses on the person claiming self-defense. It focuses on what he reasonably believes under the circumstances and presents a question of fact as to whether a safe retreat was available and whether the defendant objectively knew of it. . . . The duty to retreat is limited to the specific point in time that the defendant used deadly physical force upon the decedent. It is up to you to determine when the defendant used deadly physical force upon the decedent. *If you find beyond a reasonable doubt that a safe retreat was available and that the defendant knew about it, you should reject the self-defense claim.* . . . So, you must ask yourselves, did the defendant know that he could avoid the use of deadly physical force by retreating safely? . . . You must also reject the defendant's self-defense claim if the state proves beyond a reasonable doubt that the defendant was the initial aggressor and did not adequately retreat. . . .

that when the jury sought reinstruction on self-defense and on the duty to retreat, the court recharged, this time charging that the self-defense statute focuses on whether the defendant "subjectively" knew that safe retreat was available. The defendant excepted and sought a charge that "a person has no duty to retreat when simply confronted with the threat of physical force." The court did not give the defendant's requested charge. The jury then requested reinstruction on self-defense other than the duty to retreat. The court recharged, reiterating its initial self-defense instruction. The defendant excepted.

We conclude from our reading of the record on the court's charge on the defendant's duty to retreat that the charge complied with General Statutes § 53a-19 (b) and (c) (2). The court's charge on self-defense included the following: "If you find beyond a reasonable doubt that a safe retreat was available and that the defendant knew about it, you should reject the self-defense claim." This portion of the charge parallels the language in § 53a-19 (b), which provides in relevant part: "[A] person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety . . . by retreating . . . ." General Statutes § 53a-19 (b). Further, this court approved similar language in *State* v. *Ortiz*, 79 Conn. App. 667, 676, 830 A.2d 802, cert. denied, 266 Conn. 933, 837 A.2d 806 (2003). The court then charged: "You must also reject the defendant's self-defense claim if the state proves beyond a reasonable doubt that the defendant was the initial aggressor and did not adequately retreat. . . . If you find that the defendant was the initial aggressor,

---

If you find that the defendant was the initial aggressor, the defendant's use of force may still be justified if he *withdrew* from the encounter and made it clear to the other person that he was *retreating* from the use of force." (Emphasis added.)

the defendant's use of force may still be justified if he *withdrew* from the encounter and made it clear to the other person that he was *retreating* from the use of force." (Emphasis added.) The court's charge is in line with § 53a-19 (c), which provides in relevant part: "[A] person is not justified in using physical force when . . . (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he *withdraws* from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force . . . ." (Emphasis added.) General Statutes § 53a-19 (c). Although the court substituted the word "retreat" for the word "withdraw" in its charge, this court has held that such a minor mistake was not sufficient to mislead the jury. *State* v. *Ramirez*, 107 Conn. App. 51, 61, 943 A.2d 1138 (finding court did not mislead jury when it used "retreat" rather than "withdraw" in self-defense instructions), cert. granted on other grounds, 287 Conn. 915, 950 A.2d 1290 (2008). Further, "[w]e have held that an inadvertent slip of the tongue in summarizing jury instructions does not mean that a defendant was deprived of his right to a fair trial when the record reveals that the court properly instructed the jury on the elements of the crime." *State* v. *Mahon*, 97 Conn. App. 503, 519, 905 A.2d 678, cert. denied, 280 Conn. 930, 909 A.2d 958 (2006).

On the basis of the foregoing, we conclude that the court fairly instructed the jury on self-defense and the duty to retreat.

### III

The defendant next claims that the court failed to inquire adequately into juror bias when, after testimony that the victim was a Latin King, a sitting juror alerted the court that a family member and some of the juror's

friends were Latin Kings. The defendant further argues that the court should have removed the juror for cause. The state counters that the court made a sufficient inquiry into whether the juror could be fair and impartial and that the defendant failed to prove actual prejudice. We agree with the state.

The following additional facts are relevant to our resolution of the defendant's claim. During trial, the captain of the department of correction's intelligence unit testified that while incarcerated, the victim had been designated as a member of the Latin Kings. Immediately following that testimony, a juror alerted the court that one of his family members and some of the juror's friends were Latin Kings. Both parties agreed that further inquiry should be made into the juror's potential partiality. The defendant suggested that the court ask the juror whether sitting on a case with testimony regarding the Latin Kings would make him feel uncomfortable because of his association with the Latin Kings. The court's inquiry was as follows:

"The Court: [Juror H],[7] I have got the note that—and we appreciate, you know, you're up front in telling us about this—that you know some Latin Kings. As a matter of fact, you have a relative that's a member of Latin Kings. The fact that that's your situation, would that in any way impact your ability to be a fair and impartial juror?

"[Juror H]: No, it wouldn't, Your Honor.

"The Court: The fact that it's claimed that the deceased in the matter was a Latin King, would that in any way impact on you from your knowledge of Latin Kings and a relative who's a Latin King?

"[Juror H]: No, it wouldn't, Your Honor.

---

[7] To protect the privacy of the juror, we refer to him by initial. See *State v. Newsome*, 238 Conn. 588, 624 n.12, 682 A.2d 972 (1996).

"The Court: Do you feel that this knowledge which you have told us about would in any way detract from your ability to be a fair and impartial juror in this case?

"[Juror H]: No, it wouldn't."

The court thereafter concluded: "The knowledge of knowing Latin Kings and having a relative that is a Latin King, as has been stated by counsel, can cut both ways. He said that it wouldn't affect him either way, that he could remain a fair and impartial juror; wouldn't affect him one way or the other. My observation of him is that he was particularly strong, straightforward and certain in that regard, and the court is not going to remove him from the jury because of the information that he has given to us this evening. So, he'll remain a regular member of the jury."

The defendant claims that the court's failure to ask the juror why he raised the matter and its failure to ask open-ended questions that would have enabled the juror to "air his concerns" constituted an inadequate inquiry. The defendant further argues that the court's failure to conduct an adequate inquiry resulted in an insufficient record from which to determine whether he received a fair trial. The defendant contends that because the record is too barren to determine the extent of jury bias and whether that bias may have prejudiced the defendant, the case must be remanded for an adequate hearing. We disagree.

"To ensure that the jury will decide the case free from external influences that might interfere with the exercise of deliberate and unbiased judgment . . . a trial court is required to conduct a preliminary inquiry, on the record, whenever it is presented with information tending to indicate the possibility of juror misconduct or partiality. . . .

"Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented

with allegations [or the possibility] of jury [bias or] misconduct will necessarily be fact specific. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged [or possible] jury misconduct can fairly be characterized as an abuse of its discretion. . . . Although we recognize that trial [c]ourts face a delicate and complex task whenever they undertake to investigate [the possibility] of juror misconduct or bias . . . we nevertheless have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . Ultimately, however, [t]o succeed on a claim of [juror] bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact. . . .

"Consequently, the trial court has wide latitude in fashioning the proper response to allegations [or the possibility] of juror bias. . . . [W]hen . . . the trial court is in no way responsible for the [possible] juror misconduct [or bias], the defendant bears the burden of proving that the misconduct [or bias] actually occurred and resulted in actual prejudice. . . .

"[W]here the defendant claims that the court failed to conduct an adequate inquiry into possible juror bias or prejudice, the defendant bears the burden of proving that such bias or prejudice existed, and he also bears the burden of establishing the prejudicial impact thereof." (Internal quotation marks omitted.) *State* v. *Brown*, 96 Conn. App. 700, 704–706, 901 A.2d 86, cert. denied, 280 Conn. 912, 908 A.2d 539 (2006).

In this instance, the record reveals that the court conducted a sufficient inquiry. The court asked the juror three questions regarding his ability to remain impartial even though the juror knew, and was related to, members of the Latin Kings and the victim was a Latin Kings member. As the juror repeatedly stated that he could

be fair and impartial, it was within the judge's discretion to find him credible. There was nothing contained in the juror's answers that demanded further inquiry by the court. When a court's inquiry is adequate and the court has found the absence of any juror impropriety, the defendant has failed to establish juror bias. Id., 706. In this instance, we find no fault with the court's conclusion that this juror could fairly and impartially continue to serve. Under this circumstance, therefore, the defendant has failed to demonstrate that juror bias likely occurred and resulted in actual prejudice to him. See *State* v. *Owens*, 100 Conn. App. 619, 629, 918 A.2d 1041, cert. denied, 282 Conn. 927, 926 A.2d 668 (2007). We conclude, therefore, that the court did not abuse its discretion by the limited scope of its investigation of alleged juror bias and that the court's conclusion regarding the absence of juror bias finds adequate support in the record.

## IV

The defendant's final claim on appeal is that the court improperly instructed the jury on reasonable doubt.[8]

[8] The defendant requested that the court charge that "[a] reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act. The jury will remember that a defendant is never to be convicted on mere proof of probable guilt, but only when the state has carried its burden of proof beyond a reasonable doubt. . . ."

The court charged the jury in relevant part: "[Reasonable doubt] is such a doubt as in the serious affairs that concern you, you would heed. That is, such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. It's not hesitation springing from any feelings of pity or sympathy for the accused or any other person who might be affected by your decision. It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence. It is a doubt that is honestly entertained and is reasonable in light of the evidence after a fair comparison and careful examination of the entire evidence. On the other hand, proof beyond a reasonable doubt does not mean proof beyond all doubt. The law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law requires that after hearing all the evidence, if there was something in the evidence or lack of evidence that leaves in the minds of the jurors as reasonable men

Specifically, he argues that the court unconstitutionally diluted the state's burden of proof by instructing the jury that reasonable doubt is defined as "doubt people would act on," "heed to" or a doubt that is "substantial, real or honest." The defendant has acknowledged that the court's instructions regarding reasonable doubt have been upheld previously by our Supreme Court. See, e.g., *State* v. *Johnson*, 288 Conn. 236, 288–90, 951 A.2d 1257 (2008); *State* v. *Velasco*, 253 Conn. 210, 248–49, 751 A.2d 800 (2000); *State* v. *Griffin*, 253 Conn. 195, 207, 749 A.2d 1192 (2000). Because it is not this court's province to " 'reexamine or reevaluate Supreme Court precedent' "; *State* v. *Martinez*, 95 Conn. App. 162, 193, 896 A.2d 109, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006); we reject this claim.

The judgment is affirmed.

In this opinion the other judges concurred.

and women a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational explanation."