# STATE OF CONNECTICUT *v.* JASON OSIMANTI
## (SC 18311)

Rogers, C. J., and Norcott, Palmer, Vertefeuille, Zarella and McLachlan, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

1

2

Argued February 22—officially released November 9, 2010

*Lauren Weisfeld,* senior assistant public defender, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Joseph J. Harry*, senior assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Jason Osimanti, appeals, upon our grant of his petition for certification,[1] from the judgment of the Appellate Court affirming his judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1),[2] in connection with the death of the victim, John Barnum, following a street fight. *State* v. *Osimanti*, 111 Conn. App. 700, 701, 962 A.2d 129 (2008). The defendant claims that the Appellate Court improperly upheld the trial court's: (1) ruling precluding the admission of certain evidence concerning the victim's history of engaging in domestic violence against his former girlfriend while intoxicated, including his conviction for violation of a protective order under General Statutes § 53a-223;[3] (2) jury instructions that conflated the issues of initial aggression and retreat with respect to the defendant's claim of self-defense; and (3) insufficient inquiry into potential bias on the

[1] We granted the defendant's petition for certification limited to the following issues: "1. Did the Appellate Court properly uphold the trial court's (a) exclusion of relevant self-defense evidence and (b) instructions on self-defense?

"2. Did the Appellate Court properly uphold the sufficiency of the trial court's inquiry into alleged jury bias?" *State* v. *Osimanti*, 290 Conn. 914, 965 A.2d 554 (2009).

[2] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

[3] General Statutes § 53a-223 provides: "(a) A person is guilty of criminal violation of a protective order when an order issued pursuant to subsection (e) of section 46b-38c, or section 54-1k or 54-82r has been issued against such person, and such person violates such order.

"(b) Criminal violation of a protective order is a class D felony."

part of a juror who had personal relationships with members of the Latin Kings, the gang to which the victim had belonged. We disagree and, accordingly, affirm the judgment of the Appellate Court.

The opinion of the Appellate Court aptly sets forth the following facts, which the jury reasonably could have found, and procedural history: "On July 14, 2005, the defendant was at Custom Creations, an auto body shop owned by Orlando Rodriguez, located at 68 Elizabeth Street, Bridgeport. Rodriguez' apartment, located at 39 Elizabeth Street, was across the street. Adjacent to the shop was an empty lot. The defendant, a painter, had just returned from Rodriguez' apartment, where the defendant was monitoring the progress of two painters who were working for him. While at the shop, the defendant had been drinking alcohol, but he did not appear to be intoxicated. At one point, Rodriguez asked the defendant to pick up . . . the victim, and to bring him to the shop. Rodriguez had been friendly with the defendant and the victim for 'a couple of years.'

"When the defendant returned to the shop with the victim, both men appeared to be angry, and they were arguing. The victim accused the defendant of driving erratically on the way back to the shop. The argument between the defendant and the victim increased to the point that the victim threw things at the defendant and tried to fight him. Concerned that the argument was escalating, Rodriguez stepped between the defendant and the victim and told them to take their argument outside.

"After the defendant and the victim went into the empty lot adjacent to the shop, their argument turned physical. At trial, Rodriguez could not recall who threw the first punch. Cynthia Morales, Rodriguez' live in girl-

friend,[4] indicated that as she was returning home from a grocery store, she saw the altercation. She and Rodriguez told the defendant to get into his car, which was parked in front of the shop, and to go home. Once Rodriguez was eventually able to separate the two men, he told the defendant again to leave, and Rodriguez pushed the victim into his shop and positioned himself at the shop's front door to prevent the victim from going outside.

"At this point, the defendant went to his car, from which he retrieved a four inch long painter's hook. This was the first time that Rodriguez had seen either man with a weapon. Upon seeing the defendant with the hook, the victim took a mallet[5] from the shop and returned to the empty lot where he used the mallet to strike the defendant in the back. Rodriguez took the mallet from the victim and pushed the victim back inside his shop, but the victim immediately exited the shop through a side door and returned to the lot where a second physical altercation ensued between the victim and the defendant. At this point, Rodriguez separated the two men, told the defendant to go home and began walking the victim toward the apartment he shared with Morales. As Rodriguez was pushing the victim along the street toward his apartment, the victim was screaming at the defendant and trying to break free from Rodriguez' grasp while the defendant, in turn, was antagonizing the victim to fight with him. Morales, who had since returned to the apartment, could see Rodriguez and the victim approaching. Once Rodriguez and the victim had reached the apartment driveway,

---

[4] "On the date of the incident, Morales and Rodriguez lived together. They were no longer involved or living together at the time of the trial." *State* v. *Osimanti*, supra, 111 Conn. App. 702 n.1.

[5] "Rodriguez testified that when the victim left the shop, he was wielding a 'rubber mallet.' George Castellini, who witnessed the incident from across the street, testified that it was a 'five pound sledgehammer . . . a heavy duty mallet.' " *State* v. *Osimanti*, supra, 111 Conn. App. 703 n.2.

Morales came downstairs, where she and Rodriguez calmed the victim down. At that point, the victim was no longer arguing with the defendant.

"George Castellini, who lived across the street from Custom Creations, saw the defendant approach Rodriguez and the victim as they were walking away from the lot. He heard Rodriguez tell the defendant to leave and the victim to go into his apartment. The victim, however, refused to go into the apartment because Rodriguez' children were inside and the victim had to 'put a stop to [the defendant].'

"As the defendant neared, Rodriguez observed that he was carrying a Sheetrock knife.[6] The victim, in turn, did not have any weapons. Castellini heard Rodriguez say, 'Don't you dare come over here,' and he heard the victim say, 'What are you going to do with that knife?' The defendant stopped following Rodriguez and the victim after Rodriguez shouted for him to stay away. At this point, the defendant was approximately forty-five feet from his vehicle and sixty to seventy feet from the victim and Rodriguez. The victim then walked back into the road and toward the defendant where the two men continued arguing. The victim charged the defendant, and the two men began wrestling in the street near the empty lot. The defendant then swung the Sheetrock knife at the victim to keep him at bay. Rodriguez returned to the lot and separated the men again, both men moving to opposite sides of the street. As the defendant bent down to pick up the knife that had fallen to the ground, Rodriguez charged him, knocking the defendant to the ground. While Rodriguez had the defendant pinned to the ground, the victim began kicking the defendant. The defendant claimed that as Rodri-

[6] "The object causing the victim's death was variously referred to as a 'knife,' 'Sheetrock knife,' 'saw,' 'Sheetrock saw' and 'keyhole saw.'" *State* v. *Osimanti*, supra, 111 Conn. App. 703 n.3.

guez got off of him and separated him and the victim, the defendant grabbed the Sheetrock knife and tried to stand up because he did not want to be struck again and he feared that if he did not get up, Rodriguez and the victim would kill him. As the defendant was attempting to regain his footing, he and the victim resumed fighting. As the defendant arose, he swung the Sheetrock knife at the victim, stabbing him twice in the chest. Bleeding, the victim fell to the ground and died soon thereafter.[7]

"Immediately after the stabbing, the defendant walked to his car and left, taking the Sheetrock knife with him. He was subsequently arrested at his home and taken to the police station, where he admitted that he stabbed the victim but asserted that he acted in self-defense. The defendant was charged with one count of murder in violation of General Statutes § 53a-54a (a). On September 18, 2006, after a jury trial, the defendant was found not guilty of murder but guilty of the lesser included offense of manslaughter in the first degree in violation of § 53a-55 (a) (1). On October 23, 2006, the defendant was sentenced to the custody of the commissioner of correction for a period of twelve years, and upon completion of this sentence, to a term of five years special parole." Id., 701–705.

The defendant appealed from the judgment of conviction to the Appellate Court, claiming, inter alia, that: (1) the trial court's evidentiary rulings excluding testimony about the victim's history of engaging in domestic violence while intoxicated, as well as his conviction for violating a protective order, were an abuse of discretion and a violation of his federal and state constitutional rights to present a defense; id., 705–706; (2) "the trial court improperly instructed the jury regarding self-

[7] We note that, at the time of his death, the victim was legally intoxicated, with a blood alcohol content of 0.19 percent.

defense . . . [by] confus[ing] an initial aggressor's obligation to withdraw with the duty of one using deadly force to retreat if such retreat is available and known to be completely safe"; id., 709; and (3) the trial court "failed to inquire adequately into juror bias when, after testimony that the victim was a Latin King, a sitting juror alerted the court that a family member and some of the juror's friends were Latin Kings."[8] Id., 712–13. The Appellate Court disagreed with these claims, concluding that: (1) the trial court did not abuse its discretion by excluding the domestic violence evidence because it already had admitted "a wealth of testimony regarding the victim's propensity for violence"; id., 709; including numerous criminal convictions, his gang membership and the defendant's testimony about the altercation; id., 707–708; (2) the jury instruction was a "minor mistake" that did not mislead the jury; id., 712; and (3) the trial court's inquiry into potential juror bias was "sufficient," as there was nothing in the juror's answers that would require the trial court to inquire further or find not credible his repeated statements that he could be fair and impartial. Id., 715–16. Accordingly, the Appellate Court affirmed the judgment of conviction. Id., 717. This certified appeal followed. See footnote 1 of this opinion.

On appeal, the defendant claims that the Appellate Court improperly upheld the trial court's: (1) preclusion of evidence regarding the victim's history of engaging in domestic violence against his former girlfriend while intoxicated, including his conviction for violating a protective order; (2) self-defense jury instructions that improperly conflated the issues of initial aggression and

---

[8] The defendant also claimed on appeal to the Appellate Court that the trial court improperly had instructed the jury about the concept of reasonable doubt. *State* v. *Osimanti*, supra, 111 Conn. App. 716. The Appellate Court rejected this claim as well. Id., 717. It is not, however, before us in this certified appeal.

retreat; and (3) insufficient inquiry into potential juror bias. Additional facts and procedural history will be set forth where necessary.

I

The defendant first claims that the Appellate Court improperly upheld the conclusion of the trial court excluding the victim's history of domestic violence against his former girlfriend, Angela Giglio, including his conviction for violating a protective order under § 53a-223. The defendant further claims that this limitation "misled the jury as to whether [the victim] was a nonviolent person," and violated his right under the sixth amendment to the United States constitution[9] to establish a defense because evidence that the victim had been convicted of violating a protective order "would have raised doubt about whether the defendant was the initial aggressor—a central issue to be decided by [the] jury." The defendant further contends that the domestic violence evidence was relevant to impeach Giglio's direct examination testimony about the victim's nonviolent nature, and "to show that [he] was the initial aggressor and that the defendant reasonably feared for his safety." In response, the state contends that the trial court did not abuse its discretion because the court already had admitted ample evidence of the victim's violent nature that supported the defendant's fear of him, namely, the victim's gang membership and affilia-

[9] The sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense." The sixth amendment rights to confrontation and to present a defense are made applicable to the states through the due process clause of the fourteenth amendment. See, e.g., *State* v. *Gilberto L.*, 292 Conn. 226, 229 n.2, 972 A.2d 205 (2009).

tions, and his convictions of numerous crimes of violence during the fifteen year period prior to his death. The state further emphasizes that Giglio had testified during the offer of proof that the victim's violation of a protective order was not violent in nature, and that Giglio did not recall the specific instances referred to in the police report from that violation. Finally, the state contends that, even if the trial court improperly excluded the victim's conviction of violating a protective order, and restricted the defendant's cross-examination of Giglio, these evidentiary improprieties were harmless and did not require a new trial. We agree with the state and conclude that, even assuming that the trial court's evidentiary rulings were improper, they were harmless and did not require the Appellate Court to order a new trial.

The opinion of the Appellate Court aptly sets forth the "following additional facts [that] are relevant to our resolution of the defendant's claim. During voir dire of Giglio, outside the presence of the jury, the state limited its direct examination regarding her interactions with the victim to the period of February, 2005, to July 14, 2005. In response, the defendant made an offer of proof, on the basis of police reports concerning arguments between Giglio and the victim that occurred prior to February, 2005, in an effort to demonstrate, by cross-examination of Giglio, that the victim had a propensity for violence when intoxicated. In response to questioning by the defendant, Giglio testified that she did not remember the incident described in an October, 2003 police report that was shown to her, but she did recall getting into arguments with the victim at times and calling the police because he would not leave her house. She further testified that during the 2003 time frame, she occasionally feared that her arguments with the victim would become physical, and, in response to the defendant's questioning, Giglio acknowledged that

the victim had violated a protective order that she had obtained from the court.[10] When the defendant asked Giglio if she remembered telling the police that when the victim drank he became violent, she answered affirmatively but noted that the victim did not get violent every time he drank. On the basis of this testimony elicited during voir dire, the defendant requested that he be permitted to question Giglio, before the jury, about incidents that occurred prior to February, 2005. Specifically, the defendant sought to question Giglio about comments she had made to police officers that the victim was 'nice when he's not drinking alcohol' and her fear that the victim would be 'violent to her.' The court denied the defendant's request. Thereafter, Giglio testified before the jury that she had known the victim for nine years and was the mother of his children. In response to the state's question on direct examination as to whether Giglio had contact with the victim between February and July, 2005, she indicated that she had approximately sixty contacts with the victim during that period. She further testified that she was of the opinion that the victim was not a violent person during that period.

"Although the court limited the defendant's cross-examination of Giglio to events that occurred after February, 2005, it admitted evidence that the victim had been convicted of (1) threatening in the second degree on May 26, 2004, (2) assault in the third degree, four separate times, between July 16, 1993, and June 26, 2002, and (3) assault in the second degree on September 24, 1990. The jury also heard testimony that the victim was in prison numerous times between 1982 and 2004 and that the department of correction [department] had designated him a member of the Latin Kings street gang.

---

[10] Giglio testified during the offer of proof that she had notified the police in October, 2003, because she had an argument with the victim at her home and he had violated the protective order that was in place by not leaving.

Further, the defendant was able fully to cross-examine each witness who observed the confrontation and to present witnesses on his behalf to establish his self-defense claim. The defendant also testified that the victim had told him that the victim was 'down with the Hell's Angels'[11] and a Latin King, gangs that the defendant knew to be extremely violent. Through such testimony, the defendant was able to establish that he feared the victim, that he feared for his life when he was held down by Rodriguez and kicked by the victim, and that he did not believe that he could safely retreat to his car. The defendant introduced evidence that the victim was the initial aggressor and that the victim never withdrew from the confrontation." *State* v. *Osimanti,* supra, 111 Conn. App. 705–707.

The Appellate Court rejected the defendant's claim "that the excluded testimony regarding the victim's propensity for violence would have raised a reasonable doubt as to the evidence produced by the state to disprove self-defense because it included evidence that the victim violated a protective order obtained by Giglio and that the victim became violent when drunk." Id., 708. The Appellate Court stated that "the defendant's cross-examination of Giglio was not unduly restricted and that the limitation imposed by the court did not infringe on the defendant's confrontational and due process rights. Even without Giglio's testimony regarding events between her and the victim prior to February, 2005, there was a wealth of testimony regarding the victim's propensity for violence. Moreover, the limita-

---

[11] Richard Williams, a trooper with the Connecticut state police who monitors the activities of outlaw motorcycle gangs, testified that a person could not actually *belong* to both the Hell's Angels and another gang, such as the Latin Kings, and that the victim was not actually identified in Williams' records as a full member of the Hell's Angels. Williams also testified, however, that interested persons could take various steps to associate themselves with or express interest in the Hell's Angels short of attaining full membership, including attending events and purchasing support stickers and clothing online or through swap meets.

tion imposed by the court did not prejudice the defendant because there was no dispute that the victim was violent during his fatal altercation with the defendant. Accordingly, we conclude that the court did not abuse its discretion or deprive the defendant of any constitutional rights in restricting the scope of defense counsel's cross-examination of Giglio." Id., 709.

The defendant's right to present a defense under the sixth amendment to the United States constitution "does not compel the admission of any and all evidence offered in support thereof. . . . The trial court retains the discretion to rule on the admissibility, under the traditional rules of evidence, regarding the defense offered. . . .

"Upon review of a trial court's decision, we will set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . The trial court has wide discretion in determining the relevancy of evidence . . . and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *DeJesus*, 260 Conn. 466, 481, 797 A.2d 1101 (2002).

In a homicide or criminal assault case, "an accused may introduce evidence of the violent, dangerous or turbulent character of the victim to show that the accused had reason to fear serious harm, after laying a proper foundation by adducing evidence that he acted in self-defense and that he was aware of the victim's violent character." *State* v. *Miranda*, 176 Conn. 107, 109, 405 A.2d 622 (1978); see Conn. Code Evid. § 4-4 (a) (2).[12] "[W]e joined a majority of courts when we

---

[12] Section 4-4 (a) of the Connecticut Code of Evidence provides in relevant part: "Character evidence generally. Evidence of a trait of character of a person is inadmissible for the purpose of proving that the person acted in conformity with the character trait on a particular occasion, except that the following is admissible . . .

expanded this rule to allow the accused to introduce evidence of the victim's violent character to prove that the victim was the aggressor, regardless of whether such character evidence had been communicated to the accused prior to the homicide. . . . In *Miranda*, we determined that the victim's violent character could be proved 'by reputation testimony, by opinion testimony, or by evidence of the deceased's convictions for crimes of violence, irrespective of whether the accused knew of the deceased's violent character or of the particular evidence adduced at the time of the death-dealing encounter.' . . . This court has not, however, departed from our precedent that specific violent acts not resulting in a criminal conviction may not be introduced to prove the victim's violent character." (Citations omitted.) *State* v. *Smith*, 222 Conn. 1, 17–18, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); see Conn. Code Evid. § 4-4 (b).[13] This is because the admission of such evidence, other than convictions, "has the potential to surprise, to arouse prejudice, to multiply the issues and confuse the jury, and to prolong the trial." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 18. We note, however, that "[a] character witness may be asked, in good faith, on cross-examination about specific instances of conduct relevant to the trait of character

"(2) Character of the victim in a homicide or criminal assault case. Evidence offered by an accused in a homicide or criminal assault case, after laying a foundation that the accused acted in self-defense, of the violent character of the victim to prove that the victim was the aggressor, or by the prosecution to rebut such evidence introduced by the accused. . . ."

[13] Section 4-4 (b) of the Connecticut Code of Evidence provides: "In all cases in which evidence of a trait of character of a person is admissible to prove that the person acted in conformity with the character trait, proof may be made by testimony as to reputation or in the form of an opinion. In cases in which the accused in a homicide or criminal assault case may introduce evidence of the violent character of the victim, the victim's character may also be proved by evidence of the victim's conviction of a crime of violence."

to which the witness testified to test the basis of the witness' opinion." Conn. Code Evid. § 4-4 (c).

Evidence of a homicide victim's violent criminal record may be of "such importance to the defendant's claim of self-defense that its exclusion [may] [deprive] the defendant of his sixth amendment right fairly to present to the jury his version of the facts." *State* v. *Carter*, 228 Conn. 412, 427–28, 636 A.2d 821 (1994), overruled on other grounds by *Label Systems Corp.* v. *Aghamohammadi*, 270 Conn. 291, 852 A.2d 703 (2004); see also *State* v. *Carter*, supra, 423, 428–29 (trial court improperly refused to admit into evidence victim's record convictions of assault and possession of narcotics with intent to sell solely on ground that evidence was offered too late in trial). Nevertheless, "[n]otwithstanding this general rule of admissibility, we have held that the defendant is not authorized to introduce any and all convictions of crimes involving violence, no matter how petty, how remote in time, or how dissimilar in their nature to the facts of the alleged aggression. In each case the probative value of the evidence of certain convictions rests in the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Carter*, supra, 423; see also, e.g., *State* v. *Maxwell*, 29 Conn. App. 704, 714, 618 A.2d 43 (1992) ("The admissibility of evidence designed to show the violent nature of the victim's character lies within the broad discretion of the trial court. . . . The resolution of issues relating to relevancy and remoteness of such evidence is left to the trial court's sound discretion." [Citation omitted.]), cert. denied, 225 Conn. 904, 621 A.2d 287, cert. denied, 509 U.S. 930, 113 S. Ct. 3057, 125 L. Ed. 2d 740 (1993).

Even if we assume, without deciding,[14] that the trial court improperly: (1) excluded evidence that the victim

[14] See, e.g., *State* v. *Bonner*, 290 Conn. 468, 501, 964 A.2d 73 (2009) ("[e]ven if we assume, arguendo, that the challenged evidence was improperly admitted, the defendant has failed to show that such impropriety was harmful").

had been convicted of violating a protective order;[15] and (2) restricted the defendant's cross-examination of Giglio to the period of time after February, 2005, thus precluding him from eliciting from her testimony concerning the victim's propensity for violence while intoxicated, we conclude that these rulings were harmless error and did not require reversal. For purposes of allocating the burden to prove harm from an evidentiary impropriety, we first note that, "[i]f an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *George J.*, 280 Conn. 551, 592, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007). Whether a trial court's ruling that improperly restricts a witness' testimony "in a criminal

---

[15] We note, however, that the offense of violating a protective order in contravention of § 53a-223; see footnote 3 of this opinion; is not by itself a violent offense, although certain underlying acts constituting the violation of a particular protective order might well be. See, e.g., *State* v. *Fagan*, 280 Conn. 69, 77–78, 905 A.2d 1101 (2006) ("[T]he intent required to prove a violation of § 53a-223 [a] is only that the defendant intended to perform the activities that constituted the violation of the protective order. In the present case, the activity that constituted the violation of the protective order was coming within 100 yards of [the complainant]. Thus, the state needed to prove that the defendant came within 100 yards of [the complainant] and that this act resulted from intentional conduct rather than accident or mistake."), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007); *State* v. *Hasfal*, 94 Conn. App. 741, 744–45, 894 A.2d 372 (2006) ("To prove a charge of criminal violation of a protective order, the state must demonstrate that a protective order was issued against the defendant in accordance with General Statutes §§ 46b-38c [e] or 54-1k, and it must demonstrate the terms of the order and the manner in which it was violated by the defendant. . . . Regarding the mental element of the crime, we have explained previously [that] a violation of a protective order does not incorporate the specific intent to harass. . . . All that is necessary is a general intent that one intend to perform the activities that constitute the violation." [Citation omitted; internal quotation marks omitted.]).

trial deprives a defendant of his due process right to present a defense is a question that must be resolved on a case by case basis." (Internal quotation marks omitted.) *State* v. *William C.*, 267 Conn. 686, 707, 841 A.2d 1144 (2004).

In this case, we agree with the state that the trial court's rulings did not deprive the defendant of his constitutional right to present his claim of self-defense and, specifically, to support it with evidence of the victim's violent character, as the defendant was able to introduce evidence to that effect in the form of the victim's lengthy criminal record and gang affiliations, as well as through his cross-examination of Giglio that established that she did not have an opportunity to observe the victim on the day of his death, a fact that the defendant relied on in his closing argument. Thus, any evidentiary impropriety was not of the magnitude necessary to establish a constitutional violation. See id., 707–708 (improper exclusion of department of children and families' records indicating problems with victim's veracity in sexual assault case was, although harmful evidentiary error, not of constitutional magnitude because defendant had opportunity to elicit issues concerning victim's veracity through extensive cross-examination); *State* v. *Barletta*, 238 Conn. 313, 322–23, 680 A.2d 1284 (1996) (improper restriction on expert's testimony about likely effects of cocaine ingestion on eyewitness was not of constitutional magnitude because defendant was able to cross-examine that eyewitness about her cocaine use, criminal record including narcotics convictions, and inducement from state to testify); *State* v. *Jones*, 205 Conn. 723, 730–32, 535 A.2d 808 (1988) (improper restriction on testimony of defendant's sister concerning reasons for defendant's flight, namely, his fear of victim's family, was not of constitutional magnitude because defendant had explained flight in his own testimony); cf. *State* v. *Esposito*, 235

Conn. 802, 823–25, 670 A.2d 301 (1996) (improper exclusion of evidence that would have explained why defendant had lied to police did not violate defendant's constitutional right to present defense because evidence did not pertain directly to defendant's defense theory of nonparticipation in robbery and murder); *State* v. *Torres*, 210 Conn. 631, 642–43, 556 A.2d 1013 (1989) (The improper exclusion of prior inconsistent statements regarding descriptions of the perpetrator "escalated to constitutional proportions when the trial court, while limiting the defendant to inconsistent statements made after the probable cause hearing . . . admitted three consistent statements offered by the state that were all made before the probable cause hearing. The exclusion of the defendant's proffered inconsistent statements while admitting the state's consistent statements was not evenhanded and thus violated the defendant's due process right to a fair trial.").

Accordingly, to the extent that we assume impropriety in the trial court's evidentiary restrictions, "[w]hen an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [the improper admission of a witness' testimony] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by

the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Beavers*, 290 Conn. 386, 419, 963 A.2d 956 (2009), quoting *State* v. *Sawyer*, 279 Conn. 331, 352, 357–58, 904 A.2d 101 (2006), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008).

Having reviewed the record in the present case, we have more than a fair assurance that any impropriety with respect to the restriction of Giglio's testimony, and the accompanying cross-examination, to the time period between February and July, 2005, did not substantially affect the verdict in this case. First, as the Appellate Court noted, there was ample evidence admitted of the victim's violent tendencies prior to that time period, namely, his decades of violent criminal convictions, his interest in the Hell's Angels and his Latin Kings membership,[16] which the jury learned of in connection with the victim's past prison sentences through the testimony of Armando Valeriano, a captain with the intelligence unit of the department. Moreover, the testimony that the defendant sought to elicit from Giglio was not precisely germane to the context of this case; the defendant sought to inquire about the victim's past behavior toward Giglio, which had occurred in the qualitatively distinct context of their relationship, rather

---

[16] "Generalized testimony about the violent tendencies of gang members unconnected to the victim . . . is not relevant to a determination of the justification of self-defense. . . . Similarly, testimony about gang symbols and organization are irrelevant, without evidence linking those characteristics to the victims. . . . A defendant asserting the justification of self-defense, based on his belief that the victims were gang members, need not prove that the victims were, in fact, gang members. A general fact about gang characteristics or membership must, however, in order to be relevant, provide the jury with a rational, and not a speculative basis upon which to infer that the defendant's belief that certain individuals were gang members was reasonable." (Citations omitted.) *State* v. *Ramos*, 261 Conn. 156, 178–79, 801 A.2d 788 (2002).

than to inquire as to Giglio's knowledge of how the victim had conducted himself in the course of nondomestic altercations, like those in the present case. Cf. *State* v. *Williams*, 79 Ohio St. 3d 459, 462, 683 N.E.2d 1126 (1997) ("[i]n contrast to 'stranger' violence, domestic violence arises out of the relationship between the perpetrator and the victim"). Further, as the state observes, Giglio's testimony during the offer of proof regarding the victim's violent nature prior to February, 2005, was not categorical; she noted that he did not *always* become violent when he was intoxicated.

Finally, and most significantly, a review of the summations in this case demonstrates, as was acknowledged by defense counsel at trial, that the most significant factual issue in this case with respect to the self-defense claim—indeed "probably . . . the issue [to which the jury would] devote the most time"—was whether the defendant improperly had failed to retreat prior to using deadly physical force,[17] as is required by General Statutes § 53a-19.[18] See also part II of this

[17] In his summation, defense counsel responded to the state's emphasis, in its principal summation, on the defendant's opportunity to leave by arguing: "You're not going to hear an instruction that you have a duty to retreat if there's a chance you might make it out of there. His Honor will instruct you on the . . . limited duty to retreat relating to if you can retreat in complete safety at the point that you are otherwise going to use deadly physical force. You as factfinders will make a determination as to what point in time it appears from the evidence that deadly physical force was utilized. Up until the point that deadly physical force was utilized you will not hear His Honor say to you that the law requires an individual to retreat." After discussing certain inconsistencies in the testimony of the state's witnesses, defense counsel again emphasized that, at the time of the initial altercation, the defendant had no obligation to retreat upon being presented with mere "physical force," notwithstanding the fact that he could have done so at that point.

[18] General Statutes § 53a-19 provides: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is

opinion. Indeed, the prosecutor concluded his rebuttal summation by emphasizing that, no matter the resolution of the factual issues pertaining to the reasonableness of the force used,[19] "[i]n either case, ladies and gentlemen, the defendant had the obligation, the duty to retreat," as "[o]ur law requires [that] before you can get into deadly physical force, if you can retreat, get out of there. Because they don't want this to happen," and that, "[e]veryone's testified [that] the defendant had

(1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he or she is in his or her dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he or she is a peace officer or a special policeman appointed under section 29-18b, a Department of Motor Vehicles inspector appointed under section 14-8 and certified pursuant to section 7-294d, or a private person assisting such peace officer, special policeman or motor vehicle inspector at his or her direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he or she abstain from performing an act which he or she is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

Section 53a-19 has been amended three times since the time of the defendant's offenses in the present case. See Public Acts 2005, No. 05-180, § 1; Public Acts 2006, No. 06-196, § 184; Public Acts 2008, No. 08-150, § 49. Those amendments having no bearing on this appeal, we refer herein to the current revision of the statute.

[19] A portion of the summations focused on the nature of the threat faced by the defendant, including the nature and relative severity of the injuries that he incurred during the course of the altercation leading up to the stabbing.

opportunities to leave and did not make use of it."[20] Given the tangential relationship of Giglio's testimony to this central factual issue in this case,[21] we conclude

[20] The prosecutor previously had argued in his opening summation that the defendant had engaged in mutual combat with the victim by taunting him, and then emphasized: *"Why didn't the defendant just leave? He could have left at the office. He could have left in the middle of the street. He could have left at the lot. Why didn't he just leave?* He didn't like [the victim]. He didn't like the fact more people—[the victim] was popular more at that location. He didn't like the fact that [the victim] bested him." (Emphasis added.) The state also argued that, after Rodriguez had broken up the fight between the victim and the defendant the first time, "the defendant determined at that point that he was going to kill [the victim] because he armed himself and he didn't take the opportunity to leave and he determined at that point . . . he was going to kill him. And he kept up on it and he chased [the victim]. He followed [the victim] down the street with an even more dangerous weapon." Discussing Rodriguez' testimony further, the prosecutor emphasized that Rodriguez "backed off when the defendant came up swinging again with the deadly weapon when *he could have just left* because [Rodriguez] said that he was between [the victim] and the defendant and he could control one, either one of them, but he couldn't control both of them. The defendant could have got out of that . . . parking lot, got to his car and left. *He could have gotten into his car when he was in the street."* (Emphasis added.)

Thereafter, in rebuttal, the prosecutor noted that the victim had reacted to the taunting of the defendant, and reiterated that the defendant was "swinging a deadly weapon trying to kill [the victim]. *He could have left.* By his testimony [the victim] is sixty feet down the road. He's forty [feet] or the defendant is forty-five feet away from his car. *He could have got to his car. He would have been a hundred-some feet away from [the victim] and he could have left.* But no. He chose to invoke deadly force. Get into a combat with [the victim] and then kill [the victim]. The reason he didn't leave, the reason he didn't back down is because he wanted to kill [the victim]." (Emphasis added.)

[21] Emphasizing his view of the importance of Giglio's testimony, the defendant argues that the state had attempted to "[present] [the victim] as a changed man because he had been in alcohol treatment," and that "[t]he successful curtailment of Giglio's testimony misled the jury into believing that [the victim] was nonviolent after he entered the treatment program . . . ." The defendant further contends that the state did dispute that the victim was in fact violent during the altercation, arguing that his actions were reactive rather than aggressive. The defendant's observations of the record are accurate, as the state did in fact respond to the defendant's evidence portraying the victim as an inherently violent person by: (1) citing, inter alia, Giglio's post-February, 2005 observations of the victim as nonviolent; and (2) questioning the accuracy of the department's having labeled the victim a Latin King. We note, however, that the state relied on the testimony of Rodriguez, and did not mention that of Giglio, in arguing that the victim became "mellow" when he consumed alcohol. The defendant responded to these points by emphasizing that these character witnesses

that the defendant has failed to carry his burden of proving that the trial court's restriction of his cross-examination of Giglio substantially affected the jury's verdict. Accordingly, the Appellate Court properly declined to disturb the trial court's discretionary rulings excluding evidence of the victim's conviction of violation of a protective order, and restricting his cross-examination of Giglio.

## II

The defendant next claims that the Appellate Court improperly upheld the trial court's instructions to the jury on self-defense under § 53a-19[22] with respect to initial aggression and the duty to retreat. Specifically, the defendant argues that the trial court's instructions, by conflating the terms "retreat" and "withdraw," improperly "confused an initial aggressor's obligation to withdraw with the duty of one using deadly force to retreat if such retreat is available and known to be completely safe, and it confused the objective aspect of the test with the subjective question of whether the actor knows safe retreat is available." In response, the state argues that the jury instructions fairly reflected the self-defense statute and did not mislead the jury. We agree with the state and conclude that the Appellate Court properly determined that the jury instructions were not misleading.

were not present at the altercation, which occurred six months after the defendant had completed the alcohol treatment program.

Indeed, in evaluating the testimony of Giglio and others that the victim was a "changed man," the jury also reasonably could have considered the fact that, notwithstanding his apparently successful completion of an alcohol treatment program five months prior, he was far more than legally intoxicated at the time of the altercation. See footnote 7 of this opinion. The jury also could have considered the ample evidence about the victim's role in the altercation as evidence of his bellicosity, including his declaration that he had to "put a stop" to the defendant. These considerations aside, a review of the arguments in their entirety demonstrates that the defendant's obligation to retreat rather than use deadly physical force was the paramount factual issue in this case.

[22] See footnote 18 of this opinion for the complete text of § 53a-19.

During the initial jury charge, after explaining general principles governing the use of deadly force in self-defense, including the objective-subjective test, the trial court instructed the jury about the retreat and provocation exceptions.[23] The trial court then explained the law

[23] The trial court initially instructed the jury: "The law recognizes an exception to the justification of using deadly physical force as self-defense. The statute further provides as follows: Notwithstanding the provisions concerning the use of reasonable force, a person is not justified in using deadly physical force upon another person if he knows that he could avoid the necessity of using such force with complete safety by retreating. The statute requires both that the retreat was completely safe and available and that the defendant knew of it. Complete safety means without any injury whatsoever to him. The self-defense statute focuses on the person claiming self-defense. It focuses on what he reasonably believes under the circumstances and presents a question of fact as to whether a safe retreat was available and whether the defendant objectively knew of it. Retreat is only required where the defendant himself knows that he can avoid the necessity of using physical force with complete safety. The duty to retreat is limited to the specific point in time that the defendant used deadly physical force upon the decedent. It is up to you to determine when the defendant used deadly physical force upon the decedent. If you find beyond a reasonable doubt that a safe retreat was available and that the defendant knew about it, you should reject the self-defense claim.

"The law stresses that self-defense cannot be retaliatory. It must be defensive and not punitive. So you must ask yourselves, did the defendant know that he could avoid the use of deadly physical force by retreating safely? If so, and yet he wishes to pursue the use of deadly physical force, you should reject the self-defense claim if you find that beyond a reasonable doubt.

"You must also reject the defendant's self-defense claim if the state proves beyond a reasonable doubt that the defendant provoked the use of physical force by the other person. Now, in order to provoke the use of physical force by another it is not enough that the defendant, by his conduct, elicited the use of physical force by another. Rather, that the defendant must have embarked upon such conduct with a specific intent to provoke the other into using physical force and that the defendant engaged in such intentional provocation with the intent to cause the other physical injury or death. The defendant must have acted with a dual intent. The intent to provoke an attack by the person provoked and the accompanying intent to cause that person physical injury or death. Again, referring to my previous definition of intent, that a person acts intentionally with respect to a result when its conscious objective is to cause such a result."

Thereafter, during deliberations, the jury requested reinstruction on the duty to retreat. The trial court instructed the jury that "A person is not justified in using deadly physical force upon another person if he knows

of initial aggressor, stating: "You must also reject the defendant's self-defense claim if the state proves beyond a reasonable doubt that the defendant was the initial aggressor *and did not adequately retreat.* Evidence of the convictions of [the victim] for violent crimes may be considered only on the issue of initial aggressor and for no other reason. If you find that the defendant was the initial aggressor, the defendant's use of force may still be justified if he *withdrew from the encounter* and made it clear to the other person that he was *retreating from the use of force.* The initial aggressor is a person who first acts in such a manner that creates a reasonable belief in another person's mind that physical force is about to be used upon that other person or persons. The first person to use physical force is not necessarily the initial aggressor. Before an initial aggressor can use any physical force, the initial aggressor must withdraw or abandon the conflict in such a way that the fact of the withdrawal is perceived by his opponent so that his opponent is aware that there is no longer any danger from the original aggression."[24] (Emphasis added.)

that he could avoid the necessity of using such force with complete safety by retreating. The statute requires both that the retreat was completely safe and available and the defendant knew of it. Complete safety means without any injury whatsoever to him. The self-defense statute focuses on the person claiming self-defense. It focuses on what he reasonably believes under the circumstances and presents a question of fact as to whether a safe retreat was available and whether the defendant *subjectively* knew of it. Retreat is only *required* where the defendant himself knows that he can avoid the necessity of using physical force with complete safety. The duty to retreat is limited to the specific point in time that the defendant used deadly physical force upon the [victim]. It is up to you to determine whether the defendant used deadly physical force upon the [victim]." (Emphasis added.) The defendant excepted to this charge as well, seeking clarification that "a person has no duty to retreat when simply confronted with the threat of physical force."

[24] Two days into jury deliberations, the trial court granted the jury's request for reinstruction on the issue of self-defense, using essentially identical language. With respect to initial aggressor, the trial court charged: "You must also reject the defendant's self-defense claim if the state proves beyond a reasonable doubt that the defendant was the initial aggressor and did not adequately retreat. Evidence of the convictions of [the victim] for violent

We note at the outset that the state does not dispute that the defendant preserved this jury instruction claim by both filing a request to charge and excepting to the charge as given. See, e.g., *State* v. *Terwilliger*, 294 Conn. 399, 406, 984 A.2d 721 (2009). "[A] fundamental element of due process of law is the right of a defendant charged with a crime to establish a defense. . . . We previously have held that [t]his fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified. . . .

"Where, as here, the challenged jury instructions involve a constitutional right, the applicable standard of review is whether there is a reasonable possibility that the jury was misled in reaching its verdict. . . . In evaluating the particular charges at issue, we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is . . . whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will

crime may be considered only on the issue of initial aggressor and for no other reason. If you find that the defendant was the initial aggressor, the defendant's use of force may still be justified if he *withdrew from the encounter* and made it clear to the other person that he was *retreating from the use of force*. The initial aggressor is a person who first acts in such a manner that creates a reasonable belief in another person's mind that physical force is about to be used upon such other person or persons. The first person to use physical force is not necessarily the initial aggressor. Before an initial aggressor can use any physical force, the initial aggressor must withdraw or abandon the conflict in such a way that the fact of the withdrawal is perceived by his opponent so that his opponent is aware that there is no longer any danger from the original aggression." (Emphasis added.)

not view [them] as improper." (Internal quotation marks omitted.) *State* v. *Ebron*, 292 Conn. 656, 685, 975 A.2d 17 (2009); see also *State* v. *Ash*, 231 Conn. 484, 493–94, 651 A.2d 247 (1994) ("[a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case" [internal quotation marks omitted]).

The challenged portion of the jury charge was intended to explain § 53a-19 (c), which provides in relevant part: "Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when . . . (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable *if he withdraws from the encounter and effectively communicates to such other person his intent to do so*, but such other person notwithstanding continues or threatens the use of physical force . . . ." (Emphasis added.) Specifically, the defendant objects to the wording of that charge, as well as the subsequent reinstruction during deliberations; see footnote 24 of this opinion and the accompanying text; specifically that which stated in relevant part that: "You must also reject the defendant's self-defense claim if the state proves beyond a reasonable doubt that the defendant was the initial aggressor *and did not adequately retreat*. . . . If you find that the defendant was the initial aggressor, the defendant's use of force may still be justified if he *withdrew from the encounter* and made it clear to the other person that he was *retreating from the use of force*." (Emphasis added.)

The defendant contends that the trial court's instruction improperly introduced a requirement of retreat into the law of initial aggressor, and emphasizes that, notwithstanding their "similar meanings" in other con-

texts, the words retreat and withdraw connote different things in the context of self-defense. Although we agree with the defendant that, in the abstract, the retreat and the initial aggressor doctrines are separate conceptual matters in the law of self-defense, we also agree with the state that, given its commonly understood usage, the use of the word retreat rather than withdraw was not confusing or misleading in the initial aggressor context. For example, Merriam-Webster's Collegiate Dictionary (10th Ed. 2001) defines withdraw, inter alia, as "to remove oneself from participation," "to draw back from a battlefield," and, most tellingly, cross-references the definition of *retreat*. That same dictionary defines retreat as "an act or process of withdrawing esp. from what is difficult, dangerous or disagreeable" or, as a verb, "to make a retreat," cross-referencing the definition of withdraw. Id.

We previously have described the doctrine of communicated withdrawal, set forth in § 53a-19 (c) (2), as one wherein the "initial aggressor must *withdraw or abandon the conflict* in such a way that the fact of withdrawal is perceived by his opponent, so that his adversary is aware that he is no longer in any danger from the original aggressor." (Emphasis added; internal quotation marks omitted.) *State* v. *Diggs*, 219 Conn. 295, 299, 592 A.2d 949 (1991); cf. *State* v. *Ramirez*, 107 Conn. App. 51, 61, 943 A.2d 1138 (2008) (The court concluded that this particular instruction is accurate because "[w]hen the court instructed the jury on self-defense, the word retreat was always prefaced in the same sentence by the term initial aggressor. This indicates that the court used the word retreat only when instructing the jury about the initial aggressor exception to self-defense. The court's use of the word retreat did not invoke the legal doctrine of the duty to retreat but rather was used synonymously with the word withdraw."), aff'd, 292

Conn. 586, 973 A.2d 1251 (2009);[25] see also *State* v. *Pauling*, 102 Conn. App. 556, 583–84, 925 A.2d 1200 (initial aggressor instruction using word "retreating" was proper explanation of § 53a-19 [c] [2]), cert. denied, 284 Conn. 924, 933 A.2d 727 (2007). Accordingly, we conclude that the Appellate Court properly upheld the trial court's jury instruction.[26]

## III

Finally, the defendant claims that the trial court did not conduct a sufficient inquiry into potential juror bias after a juror alerted the court that he knew several members, and also was related to a member, of the Latin Kings gang, to which the victim belonged. The defendant argues that the trial court's questions were "perfunctory" and improperly failed to ask the juror

[25] The defendant argues that *State* v. *Ramirez*, supra, 107 Conn. App. 61, is distinguishable because that case did not involve an instruction about the use of deadly force in self-defense, causing the Appellate Court to note therein that it "would have, therefore, been a leap for the jury to have considered the duty to retreat exception to the use of deadly force." Citing the dictionary, the defendant further argues that the use of the word retreat "connotes movement from one place to another." Reading the instruction as a whole, we disagree. Although the trial court instructed the jury separately about the retreat doctrine in a manner that connoted physical movement; see footnote 20 of this opinion and the accompanying text; its initial aggressor charge was conceptually different and made clear that the defendant's retreat in that context was not physical but, rather, a decision to turn away "from the use of force."

[26] The defendant notes, in passing, that "[t]he jury charge also removed from the jury the factual question of whether the defendant was at his place of work. Had the jury so found, he would have been entitled to his rightful statutory exception to the duty of retreat." See General Statutes § 53a-19 (b) (1) ("the actor shall not be required to retreat if he or she is in his or her . . . place of work and was not the initial aggressor"). Assuming this passing reference constitutes an adequate briefing of this claim, we agree with the state and the Appellate Court that "[t]he record reveals . . . that the stabbing occurred in an empty lot, which was a public place, not the defendant's place of work. Therefore, we need not reach the question of whether Rodriguez' apartment, where the defendant claimed he was working, could be construed as his workplace." *State* v. *Osimanti*, supra, 111 Conn. App. 709 n.5.

why he felt compelled to come forward with his concerns. The defendant further claims that the trial court should have removed that juror for cause. In response, the state contends that the trial court's questions of the juror were adequate and that the trial court did not abuse its discretion by finding credible the juror's statement that he could remain fair and impartial even after learning that the victim was a Latin King. We agree with the state and conclude that the Appellate Court properly determined that the trial court did not abuse its discretion in finding that the juror could remain fair and impartial, despite his relationship to the Latin Kings.

The record reveals the following additional relevant facts and procedural history. During trial, Valeriano, the captain of the department's intelligence unit, testified that, while incarcerated, the victim had been designated as a member of the Latin Kings, which he described as "an extremely violent organization."[27] Immediately following that testimony, a juror, H,[28] sent a note alerting the court that "he knows a lot of Latin Kings and has a relative that is a Latin King." Both parties agreed that further inquiry should be made into H's potential partiality, and the defendant suggested specifically that the court ask H whether "sitting on a case with testimony regarding [the] Latin Kings [would] make him feel uncomfortable" because of his associations with members of that group.

Thereafter, the trial court questioned H, stating, "we appreciate, you know, you're [being] up front in telling

[27] Valeriano testified, however, that the department considered the victim to be a "regular member" of the Latin Kings, rather than a "threat member" who was identified as either a gang leader or someone otherwise presenting an "immediate threat." He also testified that not all Latin Kings are considered violent. Finally, Valeriano testified that the records date from 1992, and that the victim did not receive the due process hearing that he would be entitled to under present department rules prior to being designated therein as a gang member.

[28] We refer to the juror by his initial in the interest of protecting his privacy. See, e.g., *State* v. *Newsome*, 238 Conn. 588, 624 n.12, 682 A.2d 972 (1996).

us about this—that you know some Latin Kings. As a matter of fact, you have a relative that's a member of [the] Latin Kings. The fact that that's your situation, would that in any way impact your ability to be a fair and impartial juror?

"[H]: No, it wouldn't, Your Honor.

"The Court: The fact that it's claimed that the deceased in the matter was a Latin King, would that in any way impact on you from your knowledge of Latin Kings and a relative who's a Latin King?

"[H]: No, it wouldn't, Your Honor.

"The Court: Do you feel that this knowledge which you have told us about would in any way detract from your ability to be a fair and impartial juror in this case?

"[H]: No, it wouldn't."

After extensive argument from the parties, the trial court denied the defendant's request for an opportunity to question H further about his objectivity, as well as his concomitant request to remove H for cause,[29] concluding that he could remain on the jury, as the "knowledge of knowing Latin Kings and having a relative that

[29] Specifically, the defendant relied on this court's decision in *State* v. *Esposito*, 223 Conn. 299, 613 A.2d 242 (1992), and argued that the fact that H is related to a Latin King might bias him only toward seeing the "good side" of his relative, and that it would be "prudent, erring on the side of caution, to eliminate any risk" by discharging H and appointing an alternate juror to take his place. In response, the prosecutor analogized Latin Kings to any other discernible ethnic or occupational group, and argued that H should not be excluded automatically purely because of his connection to them. In response, the defendant argued that the gang issue specifically was not discussed during jury selection, because the parties had agreed that it could be addressed during trial if necessary, and that the defendant reasonably would have used a peremptory challenge on H had he been aware of his connection to the Latin Kings at that time. The prosecutor argued then, that it was wasteful to inquire of H, rather than simply dismissing him immediately, and that the fact that he thought it important to apprise the court was "a sign of a person who's going to do his job in the jury," and that the defendant was asking the court to violate H's right to sit despite his answers that he could be fair and impartial.

is a Latin King . . . can cut both ways. He said that it wouldn't affect him either way, that he could remain a fair and impartial juror; wouldn't affect him one way or the other. My observation of him is that he was particularly strong, straightforward and certain in that regard, and the court is not going to remove him from the jury because of the information that he has given to us this evening."

Potential juror bias is considered akin to other misconduct that similarly might affect a juror's impartiality, thus potentially violating a "core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution."[30] *State* v. *Brown*, 235 Conn. 502, 522, 668 A.2d 1288 (1995); see also, e.g., *State* v. *Mukhtaar*, 253 Conn. 280, 296–97, 750 A.2d 1059 (2000). A trial court is required to "conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury [bias or] misconduct in a criminal case, regardless of whether an inquiry is requested by counsel. Although the form and scope of such an inquiry lie within a trial court's discretion, the court must conduct some type of inquiry in response to allegations of jury [bias or] misconduct. That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course,

---

[30] For the text of the sixth amendment to the United States constitution, see footnote 9 of this opinion.

Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. . . ."

all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto.

"A great deal is at stake in a criminal trial. The interests involved go beyond the private interests at stake in the ordinary civil case. They involve significant public interests. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. . . . Indeed, the criminal jury trial has a role in protecting not only the liberty of the accused, but also the entire citizenry from overzealous or overreaching state authority. . . . In addition, the state has a valid and weighty interest in convicting the guilty. . . .

"The trial judge plays a crucial role in ensuring that a criminal defendant receives a fair trial by an impartial jury, and must be ever vigilant, throughout the course of the trial, to guard against jury partiality. In a criminal trial, the judge is more than a mere moderator of the proceedings. It is [the judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. . . . The jury room cannot be guarded with too much vigilance and jealousy. Courts must reject all evidence not received on the trial, and must repel every foreign influence, which may affect the minds of the jury. . . .

"We recognize that the trial judge has a superior opportunity to assess the proceedings over which he or she personally has presided . . . and thus is in a

superior position to evaluate the credibility of allegations of jury misconduct, whatever their source. There may well be cases, therefore, in which a trial court will rightfully be persuaded, solely on the basis of the allegations before it and the preliminary inquiry of counsel on the record, that such allegations lack any merit. In such cases, a defendant's constitutional rights may not be violated by the trial court's failure to hold an evidentiary hearing, in the absence of a timely request by counsel."[31] (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 235 Conn. 526–28.

With respect to allegations that a juror potentially may be biased, "[e]ven where a juror has formed some preconceived opinion as to the guilt of an accused, a juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based on evidence in the case. . . . Only where a juror has indicated a refusal to consider testimony and displayed evidence of a closed mind concerning [the] defendant's innocence can it be said that [the court] abused its discretion in refusing to [remove] a juror [from the panel]. . . . It is enough if a juror is able to set aside any preconceived

---

[31] "Our requirement that any allegations of jury misconduct necessitate some type of a preliminary inquiry still leaves the form and scope of such an inquiry to be determined by the trial court within the exercise of its discretion. . . . In the proper circumstances, the trial court may discharge its obligation simply by notifying the defendant and the state of the allegations, providing them with an adequate opportunity to respond and stating on the record its reasons for the limited form and scope of the proceedings held. In other circumstances, the trial court itself may need to cause an investigation of the allegations of jury misconduct to be conducted through informal or formal means. If the trial court determines that a proper assessment of allegations requires an evidentiary hearing, it possesses wide discretion in deciding how to pursue an inquiry into the nature and effect of information that comes to a juror improperly as well as its potential effect upon the jury if it learns of it. . . . Any form of proceeding, of course, must be on the record." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 235 Conn. 529.

notions and decide the case on the evidence presented and the instructions given by the court. . . . While we recognize that a juror's assurances that he or she is equal to the task are not dispositive of the rights of an accused . . . we are aware of the broad discretion of a trial judge which includes his determination of the credibility to be given a juror's statement in this context." (Citations omitted; internal quotation marks omitted.) *State* v. *Cubano*, 203 Conn. 81, 91–92, 523 A.2d 495 (1987).

The trial court's assessment of the juror's assurances, while entitled to deference, must be realistic and informed by inquiries adequate in the context of the case to ascertain the nature and import of any potential juror bias. See id., 90–91 (trial court properly permitted juror to continue to serve after she assured court that she could be fair and impartial, despite her expression of "shock" to learn that she and defendant had mutual friend, which defendant considered to be juror's premature expression of belief in his guilt); cf. *State* v. *Esposito*, 223 Conn. 299, 310–11, 613 A.2d 242 (1992) (trial court abused its discretion by failing to excuse juror for cause, despite her "assurances that she could be evenhanded," because of her two admissions during voir dire "that acquitting the defendant would put her in an awkward position because she would have to return to her neighborhood with the crimes still unresolved"); *People* v. *Chavez*, 275 App. Div. 2d 888, 889, 713 N.Y.S.2d 386 (trial court properly granted prosecution's peremptory challenge to prospective juror, despite prospective juror's statement that she could be "fair and impartial," when "she was 'sobbing and crying, apparently screaming and upset,' when she approached the court, because she feared retribution if [the] defendant were convicted"), appeal denied, 95 N.Y.2d 962, 745 N.E.2d 399, 722 N.Y.S.2d 479 (2000). The inquiry need not, however, be lengthy, so long as the questions,

viewed in the context of the juror's answers, are adequate for the trial court to determine that the juror can indeed serve fairly and impartially. *State* v. *Camera*, 81 Conn. App. 175, 179–81, 839 A.2d 613, cert. denied, 268 Conn. 910, 845 A.2d 412 (2004). The nature and quality of the juror's assurances is of paramount importance; the juror must be unequivocal about his or her ability to be fair and impartial. See *State* v. *Jurado*, 109 Conn. App. 628, 634–35, 952 A.2d 812, cert. denied, 289 Conn. 937, 958 A.2d 1246 (2008); see also *People* v. *Burdo*, 256 App. Div. 2d 737, 740, 682 N.Y.S.2d 681 (1998) ("[e]quivocal, uncertain responses, including statements that a prospective juror will 'try' or 'hope' to be impartial, are insufficient in the absence of 'express and unequivocal' declarations that the juror will put any preconceptions aside and render an impartial verdict based solely on the evidence").

Having reviewed the record in the present case, we conclude that the trial court's inquiry into H's potential bias, and its ultimate determination that he could continue to serve on the jury, was not an abuse of its discretion. In particular, the trial court assessed H's statement that he could remain a fair and impartial juror as "particularly strong, straightforward and certain," which was consistent with the court's actual observation of H and his direct and unequivocal responses to the trial court's questions regarding whether he could be a fair and impartial juror, and whether the fact that the victim was a Latin King was of any import. Compare *State* v. *Zapata*, 119 Conn. App. 660, 701–702, 989 A.2d 626 (2010) (trial court did not abuse discretion by permitting juror to continue to serve after she improperly discussed general facts of case with her sibling and she answered: " 'No. No. Not whatsoever,' " to question about whether discussions affected her ability to remain fair and impartial), with *State* v. *Jurado*, supra, 109 Conn. App. 634–35 ("Tellingly, rather than responding to [the trial court's] questions [about the juror's ability

to remain impartial given the juror's friendly relationship with the testifying police officer] with an unabashed 'yes' or an unequivocal 'no,' [the juror] answered with less than certainty, in this instance: 'I don't think I should. I don't think I would.' "). Further, the relative brevity of the trial court's questioning does not constitute an abuse of discretion when the questions, viewed in the context of the juror's unequivocal answers, were adequate to determine that the juror can indeed serve fairly and impartially. See *State* v. *Camera*, supra, 81 Conn. App. 179–81 (trial court's three question inquiry to juror who had some concern about his name being in court was adequate to determine that juror could remain fair and impartial).

Moreover, in our view, a significant factor in the context of this case that supports the trial court's exercise of its discretion is the fact that H came forward on his own and alerted the court to his connection to various Latin Kings, an act that was probative of his inclination to fulfill the duties of a juror faithfully and impartially. Put differently, the trial court reasonably might have concluded that, if H's connections to the Latin Kings left him inclined to be less than fair and impartial toward the defendant, he likely would have kept that information to himself in an attempt to ensure that he remained on the jury to vote to convict the defendant. Cf. *State* v. *Esposito*, supra, 223 Conn. 310–11 ("a prospective juror's assessment of his or her own partiality must be carefully scrutinized on appeal and considered in the context in which it was uttered" because that juror "may be lying in an effort to be chosen for the jury, embarrassed to reveal unsavory truths publicly or simply unaware of the existence of bias" [internal quotation marks omitted]). Finally, the fact that the jury acquitted the defendant of murder, and convicted him of the lesser included offense of manslaughter in the first degree, supports the conclusion that its members, including H, were impartial. See

*State* v. *Bozelko*, 119 Conn. App. 483, 494, 987 A.2d 1102 ("[t]he fact of the jurors' impartiality was reinforced by their finding the defendant guilty of some charges and not guilty of other charges"), cert. denied, 295 Conn. 916, 990 A.2d 867 (2010). Accordingly, we conclude that the Appellate Court properly determined that the trial court's investigation and conclusion with respect to potential bias on the part of H was not an abuse of its discretion.[32]

---

[32] The defendant also contends that the Appellate Court applied an improper standard under the federal constitution for determining which party is responsible for proving the existence of harm arising from jury bias or misconduct. The defendant first notes an inconsistency in our case law, observing that, in *State* v. *Rodriguez*, 210 Conn. 315, 325–26, 554 A.2d 1080 (1989), we followed *Remmer* v. *United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954), and stated that, "[w]here an accused makes a plausible claim that his constitutional right to a fair trial may be violated because the jury is not impartial, the burden is upon the state to rebut the presumption of prejudice that denies a fair trial." *State* v. *Rodriguez*, supra, 326. The defendant notes properly that this conclusion stands in contradiction to our subsequent decision in *State* v. *Rhodes*, 248 Conn. 39, 48, 726 A.2d 513 (1999), wherein we declined to revisit "our precedent that places the burden on the defendant to show that he or she was actually prejudiced by the juror misconduct when the trial court is in no way responsible for the impropriety." Relying primarily on *Remmer*, which had imposed a rebuttable presumption of juror prejudice in cases of improper communication, contact or tampering with jurors, the defendant contends perfunctorily that we should overrule the long line of case law following *Rhodes*, which puts the burden of proving actual prejudice on the defendant, rather than the state. See, e.g., *State* v. *Walker*, 80 Conn. App. 542, 557 n.8, 835 A.2d 1058 (2003) (collecting cases from Supreme and Appellate Courts), cert. denied, 268 Conn. 902, 845 A.2d 406 (2004).

In *State* v. *Rhodes*, supra, 248 Conn. 48, we declined to address the identical claim, namely, that under *Remmer*, "we should reconsider our precedent that places the burden on the defendant to show that he or she was actually prejudiced by the juror misconduct when the trial court is in no way responsible for the impropriety." We saw "no reason to revisit our prior case law regarding the burden or standard of proof in juror misconduct cases because the defendant cannot prevail, even under the rule he urges us to adopt. Even if it is assumed, arguendo, that the state bears the burden of proving the harmlessness of [the juror's] improper contact with [her prisoner boyfriend] beyond a reasonable doubt, the evidence supports the trial court's finding that the state satisfied that burden." Id., 50. Moreover, in *Rhodes*, we noted the federal circuit split regarding *Remmer*'s continuing vitality in light of

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

more recent United States Supreme Court case law indicating "that *Remmer* stands only for the proposition that a defendant is entitled to a hearing at which the defendant bears the burden of proving actual prejudice." Id., 49; see also id., 49–50 n.16, citing *United States* v. *Olano*, 507 U.S. 725, 739, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) (" 'There may be cases where [a jury] intrusion should be presumed prejudicial . . . but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's [deliberations], and thereby its verdict?' " [Citations omitted.]); *State* v. *Rhodes*, supra, 49, citing *Smith* v. *Phillips*, 455 U.S. 209, 215, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) (" '[t]his [c]ourt has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias' ").

In the present case, we similarly decline to resolve this issue. First, the defendant's briefing of this claim is near inadequate in that it fails to acknowledge the later Supreme Court cases or otherwise address the continuing uncertainty, more than ten years after *Rhodes* was decided, about the vitality of the *Remmer* presumption in light of *Olano* and *Smith*. See, e.g., *United States* v. *Tejeda*, 481 F.3d 44, 51 (1st Cir.) (describing "ongoing debate in the circuits"), cert. denied, 552 U.S. 1021, 128 S. Ct. 612, 169 L. Ed. 2d 393 (2007); *United States* v. *Smith*, 354 F.3d 390, 395 n.3 (5th Cir. 2003) (citing cases), cert. denied, 541 U.S. 953, 124 S. Ct. 1698, 158 L. Ed. 2d 386 (2004). Second, and perhaps more importantly, even if we were to assign the relevant burden of proof to the state, the state has carried that burden of proving that H's familiarity with certain Latin Kings did not deprive the defendant of his right to an impartial jury, because the trial court properly exercised its discretion to find that H remained able to serve fairly and impartially.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.