******************************************

The "officially released" date that appears near the
beginning of an opinion is the date the opinion will be
published in the Connecticut Law Journal or the date it
is released as a slip opinion. The operative date for the
beginning of all time periods for the filing of postopin-
ion motions and petitions for certification is the "offi-
cially released" date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecti-
cut Law Journal and subsequently in the Connecticut
Reports or Connecticut Appellate Reports. In the event
of discrepancies between the advance release version of
an opinion and the version appearing in the Connecti-
cut Law Journal and subsequently in the Connecticut
Reports or Connecticut Appellate Reports, the latest
version is to be considered authoritative.

The syllabus and procedural history accompanying
an opinion that appear in the Connecticut Law Jour-
nal and subsequently in the Connecticut Reports or
Connecticut Appellate Reports are copyrighted by the
Secretary of the State, State of Connecticut, and may
not be reproduced or distributed without the express
written permission of the Commission on Official Legal
Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* CORNEL MYERS
## (SC 20799)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy, and Moll, Js.

*Syllabus*

Convicted of murder in connection with the stabbing death of the victim, the defendant's former girlfriend, the defendant appealed to this court. Prior to trial, the trial court denied in part the defendant's motion to introduce third-party culpability evidence relating to the victim's neighbor, A. The trial court specifically excluded a video that A had sent to the victim and related text messages, a voicemail that A had left for his girlfriend after the police interviewed him about the victim's murder, evidence of A's prior misconduct, and evidence of a decline in A's mental health in the weeks following the victim's murder. The defendant claimed, inter alia, that the trial court had abused its discretion in excluding the foregoing evidence and that its exclusion violated his constitutional rights to due process, to present a complete defense, and to confrontation. *Held*:

Even if this court assumed that the trial court had abused its discretion in excluding the proffered evidence, any error was evidentiary rather than constitutional in nature, and the defendant failed to satisfy his burden of demonstrating that the error was harmful.

Any claimed error in the exclusion of the proffered evidence did not deprive the defendant of his constitutional rights because, even though the excluded evidence concerned A's relationship with the victim and his behavior following the murder, it was not central to the defendant's third-party culpability defense, and the defendant nevertheless was able to present to the jury substantial evidence and argument in support of that defense.

Moreover, this court had a fair assurance that the trial court's exclusion of the proffered evidence did not affect the jury's verdict given the overall strength of the state's case and the weakness of the defendant's third-party culpability defense, and the fact that most of the evidence supporting the defendant's third-party culpability defense was admitted and considered by the jury.

The trial court did not abuse its discretion in denying the defendant's motion for a mistrial after the prosecutor asked a police detective during redirect examination whether defense attorneys generally have an opportunity to review evidence and to request that it be sent to the state forensic science laboratory for testing and whether he had received such a request from defense counsel in this particular case.

Although the defendant claimed that the prosecutor had improperly shifted the burden of proof to the defense and that this impropriety denied him of a fair trial, the defendant failed to demonstrate that the prosecutor's questions were prejudicial in light of the entire trial, as they did not suggest that the defense was obligated to submit evidence to the state forensic science laboratory for testing, and the trial court, in its initial, curative, and final instructions to the jury, made clear that the state had the burden of proving the defendant's guilt beyond a reasonable doubt.

Argued December 2, 2024—officially released August 12, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder and home invasion, brought to the Superior Court in the judicial district of Middlesex, where the court, *Oliver, J.*, denied in part the defendant's motion in limine; thereafter, the case was tried to the jury before *Oliver, J.*; verdict and judgment of guilty of murder, from which the defendant appealed to this court. *Affirmed.*

*Erica A. Barber*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Michael A. Gailor*, state's attorney, and *Jason Germaine*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. A jury found that the defendant, Cornel Myers, murdered his former girlfriend (victim)[1] after she attempted to end their romantic relationship. On appeal from the judgment of conviction of murder in violation of General Statutes § 53a-54a (a), the defendant claims that the trial court improperly (1) excluded certain third-party culpability evidence pertaining to the victim's neighbor, and (2) denied his motion for a

---

[1] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

mistrial when the prosecutor's questioning of a witness improperly shifted the burden of proof to the defendant. We disagree and affirm the judgment of conviction.

The jury reasonably could have found the following facts. On September 7, 2018, the defendant murdered the victim in her apartment in Middletown. The defendant and the victim had been romantically involved from October, 2017, until the end of July, 2018. In July, 2018, Donna Smith, the defendant's former girlfriend, contacted the victim via Instagram to inform her that the defendant had been dating both of them at the same time. Smith, along with the defendant's former wife, Roxanne Anderson, shared with the victim additional disturbing information about the defendant with the victim, which ultimately caused the victim to end the relationship.

Despite the victim's multiple, unequivocal communications that their relationship was finished, the defendant called and texted the victim repeatedly, from the time of their breakup until her murder, often using "spoof" numbers.[2] The victim called the police, who instructed the defendant not to contact the victim again. The defendant nonetheless continued to contact her. On Monday, September 3, during a text message conversation, the defendant wrote: "I will not fall in love again fuck that shit *nobody else will never get that chance to hurt me again* fuck that *I'm hurting them first.*" (Emphasis added.) Although the victim continued to reject all of the defendant's pleas to resume their relationship, she allowed him into her apartment on Tuesday, September 4, and they had sexual intercourse. The next day, she expressed regret over the encounter and reaffirmed her position that the relationship was over.

---

[2] A "spoof" application allows a caller whose phone number has been blocked to substitute another phone number for the blocked number, thus circumventing the block.

The defendant ignored the victim's requests that he leave her alone. From Wednesday, September 5, to Friday, September 7, he persisted in texting and calling her from a spoof number, telling her that he planned to take her on a "date" on Friday. After midnight, early on September 7, the victim responded to the defendant: "You've been texting me, calling me, and showing up at my door for five hours straight. . . . Stay away from me." She then stopped responding to his messages.

At 12:35 p.m. on September 7, the defendant purchased a bouquet of flowers from a supermarket. He left the bouquet outside the victim's door, along with a handwritten note that read: "To [the victim] From Cornel. Dinner at 8 p.m. Love you." The defendant texted and called the victim throughout the day from both his actual number and a spoof number; the victim did not respond. The defendant's texts and calls continued while the victim was socializing after work with colleagues, who observed her frustration as her phone was inundated with calls that "were not stopping." The victim left her colleagues at around 10 p.m. and returned to her apartment complex at 10:17 p.m. Within minutes of her arrival, the defendant attacked the victim in her apartment. He beat the victim and stabbed her repeatedly, cutting her throat and breaking multiple knives in the process.[3]

---

[3] A responding police officer testified that, upon viewing the victim's body at the crime scene, he believed that she was "totally decapitated." A broken blade remained lodged in the victim's neck. A serrated knife with a black handle and a black handle with no blade were at the foot of the victim's bed. Two additional bloody knives were found elsewhere in the apartment, one in a trash can and another in the kitchen sink.

Susan S. Williams, an associate medical examiner with the Office of the Chief Medical Examiner, determined that the victim's cause of death was sharp force injury of the neck and torso. All of the muscles of the victim's neck, known as "strap muscles," had been cut; none remained intact. The spinal cord, internal jugular vein, carotid artery, larynx, and esophagus had also been cut. The victim suffered a total of nineteen stab wounds.

During the attack, at approximately 10:20 p.m., Kassidy Menezes, an assistant property manager at the apartment complex where the victim lived, was walking in the parking lot of the complex when she heard the victim screaming from her third floor apartment. Menezes rushed to a friend's nearby apartment to call the police. Mark Adduci, the victim's downstairs neighbor, also heard the victim screaming, along with the sounds of "someone . . . being tossed around in the room, hitting walls . . . ." Adduci texted a friend about the sounds that he heard from the victim's apartment. He left his apartment, stood in the stairwell, and continued to listen to these sounds. After calling the police, Menezes returned to the area and saw Adduci standing in the stairwell, craning his head toward the victim's third floor apartment door. From that location, Adduci could hear someone in the victim's apartment, opening and closing drawers and moving furniture, and these sounds continued after he returned to his apartment.

After receiving calls about the disturbance, the police arrived and knocked on all the doors in the building, including Adduci's, but he did not answer. Unable to locate the source of the screams, the police left.

The defendant remained in the victim's apartment. At around 11 p.m., the defendant called Smith several times. When she finally answered, the defendant asked her: "[A]re you happy at what happened?" Smith hung up. He also called Anderson, but she ignored the calls. The defendant proceeded to write a note about the victim's death on a typed letter that the victim had earlier prepared to send to a New York court in response to a traffic ticket.[4]

At approximately 3:30 a.m., the defendant called 911 to report that his girlfriend was not breathing. Stephen

---

[4] Two additional, lengthier letters, also in the defendant's handwriting, were later found in the victim's apartment.

Froberg, a Middletown police officer, was dispatched to the scene. Upon arriving, he saw the defendant standing outside of the victim's building, on the phone. The defendant led Froberg to the victim's apartment and directed him to her bedroom, where the victim's body was located, with her knees on the floor and her upper body leaning against the foot of the bed. A large amount of blood had soaked into the mattress beneath her head and upper body. After assessing the victim's condition and finding no pulse, Froberg radioed for additional assistance. Froberg patted the defendant down for weapons and instructed him to sit down outside the apartment. The defendant, whose hands and clothing were covered with dried blood, remained calm during the entire time the police were at the scene.

Police officers detained the defendant as a possible suspect. He consented to searches of his car and apartment, and provided three voluntary interviews over three consecutive days, each time waiving his *Miranda*[5] rights. During those interviews, the defendant provided conflicting accounts of his relationship with the victim and his movements on the night of the murder. In between the interviews, the police observed the defendant, still covered with the victim's blood, "laughing and smiling" during a phone call and telling the person he was speaking with that "he was in jail for the weekend because of his girlfriend."

The state charged the defendant with murder in violation of § 53a-54a (a) and home invasion in violation of General Statutes § 53a-100aa (a) (1) and (2). The case was tried to a jury, which found the defendant guilty of murder but not guilty of home invasion. The trial court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of fifty-

---

[5] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

seven years of imprisonment. This direct appeal followed. See General Statutes § 51-199 (b) (3).

I

At trial, the defendant presented a third-party culpability defense as to the victim's neighbor, Adduci. On appeal, the defendant claims that the trial court improperly excluded some evidence that he proffered in support of his third-party culpability defense. In addition to contending that the exclusion of this evidence was an abuse of discretion, the defendant argues that it violated his constitutional rights to due process, to present a complete defense, and to confront the witnesses against him.

The record reveals the following additional relevant facts and procedural history. Prior to trial, the defendant filed a motion in limine alerting the court of his intention to introduce third-party culpability evidence related to Adduci. The defendant identified several categories of third-party culpability evidence, which included Adduci's (1) presence near the crime scene, (2) avoidance of the police, (3) initial misrepresentations to the police regarding his relationship with the victim, (4) knowledge of the victim's injuries, (5) September 8, 2018 voicemail to Melody Thiel, his then girlfriend, after he was questioned by the police in connection with the victim's murder, (6) history of violence against women, and (7) behavior following the victim's murder.

After a pretrial hearing, the trial court issued a memorandum of decision addressing each category of evidence that the defendant had proffered. The court concluded that some evidence satisfied the threshold for admissibility for third-party culpability evidence; see generally *State* v. *Hedge*, 297 Conn. 621, 634–35, 1 A.3d 1051 (2010); and would be allowed "after a more detailed and clear proffer outside the presence of the jury." This evidence included (1) Adduci's presence

near the crime scene, (2) his knowledge of injuries to the victim "that [were] not known to the general public," (3) his initial representations to the police that he did not know the victim well, (4) evidence that he and the victim had socialized and exchanged text messages, and (5) a "series of hostile and vulgar texts" he had sent the victim when their friendship ended.

The trial court, however, excluded some evidence relevant to the defendant's claims on appeal. First, it excluded a video Adduci had sent the victim and others on July 31, 2018, and related text messages. In the video, Adduci appears to be in distress, lying shirtless on the floor and shaking next to a jar of pickles, mumbling phrases like "night with you," and "electrolyte imbalance." The defendant describes the video as "truly bizarre" and argues that it demonstrated that Adduci had lied to the police when he told them that he did not know the victim very well and had an "obsessive fixation with the victim . . . ." In response to the video, the victim first texted only a question mark. Adduci responded: "Mike will [be] here in [three] minutes. It's imbalance. I'll be fixed fast." The victim then texted: "Call 911." Adduci responded: "I'm naked on the floor with a bottle of pickles any other time this might [be] fun." The victim wrote back: "Ok . . . I don't know what that means. This is all very strange. And starting to creep me out tbh. Ok [M]ark, bye, hope you feel better." When Adduci informed the victim that he would call Thiel and have her bring him electrolytes, the victim texted: "This is fucking weird. Please don't text me anymore, seriously. Hope you feel better." Seven minutes later, she added: "This whole situation is really starting to freak me out. And I feel like you're really pushing boundaries. I really hope everything is ok—I am honestly very nervous around you the more encounters we do have and you texting me videos of yourself

shaking on the floor while I'm at work is extremely uncomfortable."

Second, the trial court excluded a voicemail Adduci left for Thiel after the police had interviewed him about the victim's murder. In that voicemail, Adduci told Thiel that she needed to unblock his number so that they could talk before she arrived home. He explained to her that he had become a suspect in the victim's murder and that the police were asking if both Adduci and Thiel were romantically involved with the victim. He further instructed her: "Don't go home."

Third, the trial court excluded two instances of Adduci's prior misconduct, which the defendant argued demonstrated a history of violence against women.[6] The defendant alleged that, in 2012, Adduci grabbed a woman by the neck and pushed her to the ground. He also offered a police report detailing an incident that occurred shortly after the victim's murder, in which the police were called because Adduci, while intoxicated, was banging on a female neighbor's door and yelling.

Fourth, the trial court excluded evidence of a decline in Adduci's mental health in the weeks following the victim's murder. The defendant proffered two October, 2018 police reports pertaining to Adduci, one in response to a disturbance and the other for a wellness check. In both reports, officers indicated that Adduci was drinking excessively, self-harming, and expressing that he was depressed because of the victim's homicide.

### A

We proceed by assuming, without deciding, that the trial court abused its discretion by excluding this collec-

---

[6] In his motion in limine, the defendant represented that Adduci had "several domestic violence arrests and convictions on his criminal record." There is no support in the record for the defendant's claim that Adduci's history of violence against women resulted in criminal convictions.

tive evidence.[7] The defendant contends that the exclusion of this collective evidence violated his constitutional rights to confront Adduci and to a fair trial. In response, the state argues that any error by the trial court was not constitutional in nature because, under *State* v. *Jordan*, 329 Conn. 272, 287 n.14, 186 A.3d 1 (2018), no constitutional violation occurs when "the trial court's exclusion of evidence . . . did not prevent the defendant from presenting other evidence that supported his theory of [defense]." We agree with the state. Even if we assume that the evidence was excluded improperly, we cannot conclude that this error was constitutional in nature.

"Whether the admission of the contested [evidence] was constitutional error or merely evidentiary error will dictate which party bears the burden of proof as to harm and the extent of that burden." *State* v. *Sinclair*, 332 Conn. 204, 214, 210 A.3d 509 (2019). "[I]f an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Osimanti*, 299 Conn. 1, 16, 6 A.3d 790 (2010).

---

[7] The defendant contends that the trial court's rulings were an abuse of discretion because the court applied an incorrect legal standard in its general approach to assessing third-party culpability evidence. He argues that, once a direct connection had been established as to third-party culpability with respect to some of the evidence, all of the evidence pertaining to Adduci should have been admitted. Given our conclusion that any evidentiary error was harmless, we need not consider the merits of these evidentiary arguments.

We also need not consider the state's contention that these claims were not preserved for appellate review because the defendant failed to make additional proffers during the trial. We assume, without deciding, that the defendant's evidentiary claims are preserved. See, e.g., *State* v. *Altajir*, 303 Conn. 304, 314, 33 A.3d 193 (2012).

"[T]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes." (Footnote added; internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 275, 96 A.3d 1199 (2014); see also *State* v. *West*, 274 Conn. 605, 622–23 n.26, 877 A.2d 787 (right to present defense is based on sixth amendment principles and applicable to states through due process clause of fourteenth amendment), cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005). Whether a trial court's exclusion of evidence offered by a criminal defendant deprives him of his constitutional right to present a defense "is a question that must be resolved on a case by case basis. . . . The primary consideration in determining whether a trial court's ruling violated a defendant's right to present a defense is the centrality of the excluded evidence to the claim or claims raised by the defendant at trial." (Internal quotation marks omitted.) Id., 276. We also consider the nature and quantum of other evidence that the defendant was able to present in support of his theory of defense to determine whether he has had a meaningful opportunity to challenge the state's case, including the veracity and reliability of its witnesses. See, e.g., *State* v. *Jordan*, supra, 329 Conn. 287 n.14;

*State* v. *Devalda*, 306 Conn. 494, 520–21, 50 A.3d 882 (2012); *State* v. *Osimanti*, supra, 299 Conn. 16–17.

In the present case, the defendant argues that the excluded evidence was central to his third-party culpability defense and that he was "unable to present strong evidence of [Adduci's] guilt" or to question Adduci about such evidence. We disagree. The excluded evidence, although related to Adduci's relationship with the victim and his behavior following her murder, was not central to the defendant's third-party culpability defense, and the defendant was nevertheless able to present a substantial portion of the evidence that he had proffered in his motion in limine. Defense counsel cross-examined Adduci at length about his relationship with the victim and actions after her murder, introducing facts to the jury that allowed it to draw inferences relating to his reliability and potential motives. See, e.g., *State* v. *Devalda*, supra, 306 Conn. 520–21. Adduci testified, on direct examination for the state, that he had developed a brief friendship with the victim after her dishwasher had leaked water into his apartment in June, 2018.[8] They had exchanged phone numbers and communicated often. On one occasion, Adduci texted the victim to ask if Thiel could come upstairs to see her cats. He misread the victim's reply, leading to an argument. Adduci testified that he visited the victim twice and that the victim came to his apartment once to socialize with Thiel on his deck. The jury, therefore, heard evidence of Adduci's relationship with the victim that was

---

[8] Defense counsel called Adduci's credibility into question when Adduci testified that he did not recall "downplaying" the extent to which he knew the victim to the police. Defense counsel introduced Adduci's initial statement that he had given to the police the morning following the victim's murder, in which he stated that he "knew the [victim] . . . as a neighbor, but not personally." The statement was offered for substantive purposes pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A, 2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

more extensive than what Adduci had initially represented to the police.

The defendant also was able to present evidence of Adduci's romantic interest in the victim, her rejection of his overtures, and the profane text messages that ended their friendship. Adduci testified that he once visited the victim late at night and directly expressed his romantic interest but that she had declined and told him not to ask again. The friendship between Adduci and the victim ended on bad terms in early August, 2018, when, after the victim ignored his texts for several days, he accused the victim and Thiel of talking about him behind his back.[9] On August 6, he texted the victim, in quick succession: "[Thiel] said something outside on the deck a lie that's what this is," "[y]ou have ignored me all week," and "[s]omething happened." The victim responded: "What are you talking about?" Adduci then told her: "[G]o fuck yourself and this lovely friendship," and called her "a total fucking asshole," "a fucking loser," and "a fucking robot." He further texted: "I'd cheat on [you] too," and "[n]ow I block [you] stupid cunt."[10] At trial, Adduci testified that this was the last time the two had communicated. On the night the victim

---

[9] During the week after Adduci sent the excluded video, Adduci sent the victim several additional text messages, which she did not answer. On August 3, 2018, he texted: "[You] home?" On August 4, he texted: "I guess you weren't home did I do something wrong?" A few hours later, he texted: "Can [you] tell me what I did wrong please I've always been respectful to [you] except for my misunderstanding of that text message."

[10] The victim texted in response: "You don't know me, but I agree . . . I don't wanna know you either." A few minutes later, the victim texted: "You have no right to call me an asshole or cunt. I have never wished anything on you but peace and [well-being]. I have never asked anything of you, but you have of me. When you did ask for help, I responded through our messages and in person. I do believe I did help you. So you can call me a cunt, you can call me a child, you can call me an asshole and you can call me a loser, you can call me a robot, and regardless, I still respect you and uphold you as a neighbor. I have never done anything to disrespect you ever. I have never called you a bad name or disrespected you in any way. This behavior is completely unacceptable." After this point, the victim blocked Adduci.

was murdered, Adduci sent text messages to a friend about the screams and sounds he heard coming from the victim's apartment shortly after listening from the stairwell; he commented that it "[s]ounded like a murder" and that "she's a bitch anyways."

The jury also heard evidence that Adduci avoided the police following the victim's murder. On both direct and cross-examination, Adduci admitted that he did not call the police when he heard the victim's screams or answer the door when the police knocked because he did not want to get involved in the matter and assumed the police would "figure it out." The following morning, he again did not answer his door when the police were canvassing the neighbors.[11] Defense counsel also inquired about the source of Adduci's knowledge that the victim's "throat was cut" and "her head was falling off . . . ." Adduci testified that he had heard this from a neighbor.[12] Additionally, there was evidence before the jury that the police had brought Adduci in for questioning and obtained a search warrant to collect his DNA. Finally, evidence was presented that Adduci was a bodybuilder, who was capable of exerting the type of force required to inflict the victim's injuries. During closing argument, defense counsel argued extensively that Adduci, and not the defendant, was responsible for the victim's murder. Because the jury had for its consideration a sub-

---

[11] Shortly thereafter, however, Adduci left his apartment and spoke with detectives outside. They asked him to identify himself, and he did. He "appeared slightly upset" and was "very soft spoken," but related information regarding what he had heard and seen the previous night, and he agreed to provide a sworn statement. He allowed the officers into his apartment and permitted them to examine his cell phone and to take pictures of the text messages he had sent at the time he heard the screams.

[12] Other neighbors were similarly aware of this otherwise undisclosed information. Menezes testified that she was alerted to the murder when one neighbor, Stephanie Young, called her to tell her that the victim had been "nearly decapitated." Menezes had not spoken to Adduci, and, to her knowledge, neither had Young. Menezes testified that Young told her that she had heard this information directly from the police.

stantial quantity of evidence and argument supporting the defendant's third-party culpability defense, we conclude that the defendant was not deprived of his constitutional rights to present a defense, to due process, or to confront Adduci. See *State* v. *Osimanti*, supra, 299 Conn. 17. This renders any error in excluding the proffered third-party culpability evidence purely evidentiary in nature.

B

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the [evidence] in the [defendant's] case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201, 215, 202 A.3d 350 (2019).

We conclude that the defendant has failed to meet his burden of proving that the jury's verdict was substantially swayed by any error in excluding the proffered third-party culpability evidence. Most of the defendant's proffered third-party culpability evidence was admitted and considered by the jury. Even if the

trial court had admitted all of the excluded evidence, we have a fair assurance that it would not have affected the jury's verdict. With respect to the overall strength of the prosecution's case, the state presented ample evidence establishing the defendant's guilt, including DNA evidence linking the defendant to the crime scene, his handwritten notes found in the victim's apartment after the murder, hundreds of phone calls and text messages from the defendant to the victim in the hours and days before the murder, and his conflicting statements about his relationship with the victim.

In reviewing the overall strength of the evidence that the state presented at trial to prove the defendant's guilt, we note first that the physical evidence at the crime scene—inside the victim's apartment—inculpated *only* the defendant, not Adduci. The responding officers observed that the defendant had dried blood on his hands and clothing. The defendant's pants had a very large, dark, dried blood like stain on the back right inner thigh. On the front right pant leg, there were large, dark, blood like stains spattered around the knee and inner thigh areas, along with smudges below the knee and on the upper thigh. The right sleeve of the defendant's long sleeved T-shirt had a large, pinkish stain, close to the cuff, extending approximately one quarter of the way up the forearm, wrapping around the sleeve. When these items were forensically tested, the blood matched the victim's DNA. Additionally, the defendant's DNA was found on the victim's fingernail near the victim's defensive wounds.

Second, three documents handwritten by the defendant were found at the victim's apartment after the murder. A note, left on the coffee table, was superimposed over a letter that the victim had written to a court in New York in connection with a pending traffic ticket. That note read: "I did not do it again I did not do it. Roxan[ne] [Anderson] and Donna [Smith], you guys are

the reason for this." On the back of this same note were Anderson's and Smith's full names and phone numbers, and the scrawled message, "you guys are the cause of this . . . you did [not] leave my relationship alone I hope you lad[ies] are happy now *that* [*is*] *the reason why I do it* I write this so you know everyone is gonna really think I kill her this what you want from me to get in trouble she wouldn't be by herself." (Emphasis added.) A longer letter, unsigned and undated, but written in the same handwriting as the note on the coffee table, was found in the dining room. Titled, "I AM SORRY," the letter begged for forgiveness and a second chance, admitted "fuck[ing] up," and expressed love for the victim. At trial, Smith testified that the handwriting on both the note and the letter was consistent with that of the defendant. The police found an additional letter several months later that made similar statements. The defendant claims that the two letters "were obviously penned on an earlier date." The defendant, however, told the police that he wrote all three notes or letters while he was on the phone interacting with the 911 dispatcher, while simultaneously trying to call his cousin on a separate phone.[13]

Third, the phone and text message records demonstrate that the defendant refused to accept that the victim had ended their relationship. The defendant sat for hours outside the victim's apartment, called her hundreds of times from blocked and "spoof" numbers, and ignored both her demands and police directives not to contact her. On the night of the victim's murder, the victim's colleagues witnessed her becoming so overwhelmed with calls and texts that she told them she was planning to obtain a restraining order against the defendant. Phone records show that the defendant placed twenty-eight calls to the victim that night between 7:48

---

[13] The defendant also claimed that he wrote the three notes or letters because he did not believe that the police would allow him to explain himself.

and 9:39 p.m.; at that point, the calls stopped, which coincides with the time the defendant told the police he walked through the victim's apartment building.[14]

Fourth, the text message records do not support the defendant's statements about his relationship with the victim. The defendant told the police that he was in the victim's apartment because he had an "extra key" and that it was "routine" for him to visit the victim unannounced and to get into bed with her while she was sleeping in the middle of the night.[15] This story is inconsistent with text messages indicating that the defendant regularly sought the victim's permission to enter her apartment.[16] It is also clear from the text messages that the victim no longer wanted any relationship with the defendant.[17] Nonetheless, in his first interview with the

[14] In his first interview with the police, the defendant told officers that he had stayed at his home, which was located in the same apartment complex as the victim's apartment, all evening. He explained that he spent his time smoking marijuana and sleeping, until his alarm went off at 3 a.m. to go to the victim's apartment. When informed that a witness had seen him in the parking lot of the apartment complex around 9:30 p.m., he changed his story, adding that he went out to the dumpsters and walked through the victim's building to pick up his mail.

[15] The defendant's claim that he had an extra key to the victim's apartment is further contradicted by the fact that no such key was ever located by the police. The victim informed Smith that the defendant no longer had a key and that she refused to return that key to the defendant when he asked for it on August 27, 2018.

[16] A review of the record indicates that, on September 4, 2018, when the victim allowed the defendant to come to her apartment, he texted her, "I'm at the door." On thirteen other occasions, the defendant sought the victim's permission to come to her apartment. The victim denied all of his requests, except, on August 25, when he asked to borrow an ice pack, and she threw it down to him from her deck. There is evidence in the record that the defendant had a practice of showing up uninvited at the victim's door, which the victim informed him "scared" her, and which she repeatedly told him not to do.

[17] On August 26, 2018, several weeks after the victim had broken up with the defendant, the victim texted the defendant, in response to messages he sent her from a spoof number: "It's funny how the person I loved can stalk me and harass me to the point where I feel like I need to move away and change my number." A review of the text message records shows that, despite the victim's having ended the relationship, the defendant continued

police, the defendant told officers that he and the victim were "get[ting] back together" and were working on their relationship, "taking things slow." In contrast, in a later interview, he told officers that it was "a relief" to no longer be dating the victim and that he was grateful to Smith and Anderson for getting him out of the relationship. In sum, the state presented a very strong case with a significant amount of evidence establishing the defendant's guilt beyond a reasonable doubt.

By contrast, the defendant's third-party culpability defense was weak, and the admission of the excluded evidence would not have substantially swayed the jury's verdict. The strongest and most significant evidence, according to defense counsel, was that Menezes saw Adduci in the general vicinity of the victim's apartment a few minutes after she heard the victim's screams. She did not see any blood on his person or clothing, or in the stairwell or hallway. For Adduci to have killed the victim, he would have had to attack her to induce the screams that Menezes heard, use and break multiple knives over the course of the attack, cause extensive injuries to the victim that produced a significant quantity of blood, clean the blood from his clothing and body—all while taking measures to prevent his DNA from being discovered in the apartment—and then compose himself to be seen in the stairwell standing completely still, appearing to be listening to a disturbance that was no longer occurring, upon Menezes' return a few minutes later.

Investigators found no forensic evidence linking Adduci to the actual scene of the crime, in contrast to that linking the defendant, whose DNA was found on the victim's fingernail and whose clothes and hands were covered with the victim's dried blood. See, e.g.,

---

to ask her for sex and to go on dates. She rejected his requests twenty-six times between August 26 and September 3. The week before her murder, the victim asked the defendant to stop contacting her eleven times.

*State* v. *West*, supra, 274 Conn. 627 (fingerprints found at periphery of crime scene lacked close and direct relationship with actual crime, and, "because there [were] so many likely explanations for the prints aside from the mere possibility that they were left by an unidentified perpetrator," they lacked probative value for third-party culpability purposes); see also *State* v. *Simmons*, 352 Conn. 556, 573,     A.2d     (2025) ("the connection between the evidence of third-party culpability and the crime charged must rest on grounds beyond mere proximity"). Adduci's presence in the stairwell of the building where he lived, shortly after multiple neighbors heard violent screams, does not, without more, support a finding that he caused them. But see *State* v. *Cerreta*, 260 Conn. 251, 262, 796 A.2d 1176 (2002) (evidence that third party's hair and fingerprints were found on victim's body was exculpatory and probative, raising more than bare suspicion that someone other than defendant may have committed crime).

Further, some of the excluded evidence was similar to evidence the jury already had before it. See, e.g., *State* v. *DeJesus*, 260 Conn. 466, 484–86, 797 A.2d 1101 (2002). The jury heard evidence that Adduci knew the victim personally and had developed a friendship with her, in which he overshared information. The inappropriate video that Adduci had sent to the victim, therefore, may have amplified Adduci's oversharing, but it would not have introduced any new category of evidence. The jury knew that Adduci avoided the police and that, at one point, the police had investigated him as a possible suspect. The excluded voicemail to Thiel, therefore, conveyed similar facts to those already before the jury.

When evaluating harmless error, we must also consider the quality of the excluded evidence. See, e.g., *State* v. *Massaro*, 347 Conn. 200, 217, 296 A.3d 782 (2023). Evidence that Adduci's mental health deteriorated in the weeks following the victim's murder was

only tangentially related to the victim's murder and the third-party culpability defense. Similarly, Adduci's prior acts of violence against women were unrelated to the victim's murder. One incident took place six years earlier with a different person and involved conduct different from that connected to the victim's murder. The other act, which occurred after the victim's murder, was a complaint that he banged loudly on a neighbor's door—again, unrelated and dissimilar to the victim's murder. This excluded evidence was, at best, tangential and added little for the jury to consider in determining if Adduci, and not the defendant, had committed the victim's murder.

Given the overall strength of the state's case, combined with the fact that the jury had before it the strongest evidence in support of the defendant's third-party culpability defense, we have a fair assurance that the exclusion of this evidence did not affect the jury's verdict. Accordingly, we conclude that the defendant has failed to establish that any assumed error was harmful.

## II

The defendant next claims that the trial court improperly denied his motion for a mistrial after the prosecutor improperly shifted the burden of proof to the defendant during the redirect examination of Jeffrey Laskowski, a police detective. The defendant argues that the alleged impropriety deprived him of a fair trial because it "was severe and went to the central issue in the case," namely, his claim that the police had mishandled the investigation of the victim's murder. We disagree.

The following additional facts and procedural history are relevant to this claim. On the final day of the state's evidence, Laskowski testified that, when police officers searched the dumpsters outside of the victim and Adduci's building on September 9, 2018, they found a plastic bag containing wet towels with brownish stains. The officers seized the towels as potential evidence and

transported them to the police station, where they were dried but not tested for blood or sent to the state forensic science laboratory (lab). During cross-examination, defense counsel pressed Laskowski to explain why the towels had been seized as evidence but were not sent for testing. Laskowski testified that, when the officers searched the dumpster immediately following the victim's murder, the towels were not present. On the basis of an interview with a resident of the apartment complex, the officers determined that the towels were likely placed in the dumpster on September 9, two days after the victim was murdered. Laskowski testified that detectives determined that it was not necessary to send the towels for testing because, once they had dried, the brownish stains no longer appeared to be blood stains. During redirect examination, the prosecutor then asked whether defense attorneys have an opportunity to review evidence and to request that materials be sent to the lab for testing. Laskowski responded that they do. The prosecutor's final question to Laskowski was whether he had received such a request from defense counsel. Laskowski testified that he had not.

Outside the presence of the jury, defense counsel argued that Laskowski's testimony may have given the jury the impression that the defense was obligated to have the evidence tested and that the defendant had the burden to produce evidence or to disprove his guilt. Defense counsel moved for a mistrial. The trial court denied the motion for a mistrial on the ground that it was "too extreme a remedy" and disagreed that Laskowski had testified that it was the defense's burden to produce or test evidence.

When the jury returned, the trial court gave it the following instruction: "[T]here was just some testimony that defense counsel had the opportunity to request testing of certain items of evidence. This testimony should not be taken by you as any indication that the defense has the obligation or burden to do so, or that

the defendant has to prove his innocence, or lack of guilt. Please recall my earlier instruction[s], when this case began, that the state alone bears the burden to prove the defendant's guilt, if it can, beyond a reasonable doubt. The defense does not have the burden to produce any evidence, or to prove lack of guilt, and that burden of proof never shifts to the defense." In its final charge to the jury, the court reiterated that "the state alone bears the burden of proof" and that "[t]he defendant does not have to prove his innocence." The court further instructed the jury that the failure of the *police* to test physical evidence could be considered when determining if there was a reasonable doubt as to the defendant's guilt.

It is well established that we review a trial court's ruling on a motion for a mistrial for an abuse of discretion. See, e.g., *State* v. *Holley*, 327 Conn. 576, 628, 175 A.3d 514 (2018). "[Although] the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence [during] the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances [that] may arise during the trial in which his function is to assure a fair and just outcome. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court."[18] (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 702, 911 A.2d 1055 (2006).

---

[18] The defendant argues that we should apply plenary review to this mistrial claim because it arises from a claim of prosecutorial impropriety. We disagree. "[W]hen a mistrial is sought on the ground that a prosecutor's improper remarks violated the defendant's constitutional right to due process of law the same standard applies. . . . The burden on the defendant is to show that the prosecutor's remarks were prejudicial in light of the

In determining whether a mistrial was required because of a potentially prejudicial event during the trial, we also consider "whether the trial court's curative instructions remedied any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *Cook*, 262 Conn. 825, 842, 817 A.2d 670 (2003). In the absence of any indication to the contrary, the jury is presumed to have followed the trial court's curative instructions in reaching its verdict. See, e.g., *State* v. *Outlaw*, 350 Conn. 251, 284, 324 A.3d 107 (2024).

We conclude that the trial court did not abuse its discretion in denying the defendant's motion for a mistrial. The defendant has not demonstrated that the prosecutor's questions were prejudicial in light of the entire proceeding. As the trial court observed, the prosecutor's questions did not suggest that the defense was obliged to send materials to the lab for testing, and the court's curative instruction omitted any reference to the fact that the defendant had that opportunity.[19] In its initial, curative, and final instructions, the court was clear that the burden of proof lies with the state. With no indication to the contrary, we presume that the jury followed each of those instructions in its deliberations, which mitigated any prejudice that may have resulted from the challenged questions. The trial court, therefore, did not abuse its discretion by not ordering the drastic remedy of a mistrial.

The judgment is affirmed.

In this opinion the other justices concurred.

entire proceeding." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 703, 911 A.2d 1055 (2006); see also *State* v. *James G.*, 268 Conn. 382, 420, 844 A.2d 810 (2004) ("[this court has] afforded deference to trial courts in deciding whether to deny a defendant's motion for a mistrial that is based on prosecutorial misconduct").

[19] Defense counsel objected to the trial court's draft instruction, which referenced the opportunity of the defense to test evidence. The court removed this reference from its curative instruction to the jury, although defense counsel did not agree to that curative instruction.